**Maxine SMITH, Plaintiff-Appellee,**

v.

**Charles ROWE, John Platt, Frank Deere, Charlotte Nesbitt, Defendants-Appellants.**

No. 83–3099.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1985.

Decided April 26, 1985.

G. Flint Taylor, Peoples Law Office, Chicago, Ill., for plaintiff-appellee.

Vincenzo Chimera, Illinois Asst. Atty. Gen., Chicago, Ill., for defendants-appellants.

Before ESCHBACH and COFFEY, Circuit Judges, and JAMESON, Senior District Judge.*

JAMESON, District Judge.

Defendants-appellants, Charles Rowe, John Platt, Frank Deere, and Charlotte

* The Honorable William J. Jameson of the District of Montana, sitting by designation.

Sutliff-Nesbitt have appealed from a judgment in favor of plaintiff-appellee, Maxine Smith, for $80,700 compensatory damages and $20,000 punitive damages in a 42 U.S.C. § 1983 action seeking injunctive relief and damages for her unconstitutional placement and continuation in segregation in Dwight Correctional Center while an inmate there. We affirm.

## I. Factual Background

In October of 1976 Maxine Smith, a 47 year old black woman, had been incarcerated at Dwight Correctional Center for four years. She lived in an Honor Cottage and enjoyed minimum security status. She had been convicted of killing her boy friend who had physically abused her. She was serving a 20–60 year sentence. Prior to her conviction she had been a nurse.

During her stay at Dwight, Smith quickly emerged as an inmate leader, becoming a member of the Prisoners Advisory Committee and a Cottage Representative. Other women inmates came to her for help with their legal problems. Warden Robert Buchanan allowed a group of lawyers, law students and paralegals to teach a bimonthly law class to the prisoners at Dwight. Smith was their star pupil. Smith began to assume the role of a jailhouse lawyer.

In late 1974, John Platt replaced Buchanan as the warden. He instituted a more restrictive regime. More women were sent to segregation for minor offenses, the inmate council was disbanded, communication with the warden was curtailed, and the law class was monitored.

Smith responded to the new conditions by more actively pursuing her role as Dwight's only woman jailhouse lawyer.

She filed numerous grievances, including one on behalf of 25 inmates against Warden Platt. She notified the Chief Investigator of the Department of Corrections of criminal activities of Dwight employees. Smith was also in contact with the Governor of Illinois, the Director of the Department of Corrections, and the press concerning the conditions at Dwight.

In early 1975 the civilian librarian requested that Smith take the law library position because of her knowledge of law. As the law librarian she was able to more effectively practice as a jailhouse lawyer. She visited the segregation unit once a week to deliver law books and to talk to the women segregated there about their problems. She translated legal documents for the women, wrote correspondence for them, taught them how to do legal research, and wrote a monthly legal column for the prison newspaper.

In late 1975 Smith was no longer permitted to talk to the prisoners she visited in segregation. Soon thereafter she was barred from the segregation unit altogether. In April, 1976, the law class was banned. Smith led an unsuccessful petition drive to get it reinstated.

On October 18, 1976, officer William Doherty was ordered by Warden Platt and Assistant Warden of Security, Frank Deere, to search Smith and her cottage. He found a kodak camera with film, three cassette recorder microphones, a tape recorder, and four tape cassettes. Platt and Deere determined that Smith should be charged with "(p)assing or receiving contraband" as prohibited by Administrative Regulation 804(H)(1)(m) and Bulletin # 44.[1]

1. Regulation 804(H)(1)(m) prohibits:
 "(p)assing or receiving contraband from another resident visitor and/or employee."
 Information Bulletin # 44 dated July 29, 1975, reads:
 **EMPLOYEE-RESIDENT BULLETIN**
 Re: Electronic Equipment
 In accordance from a directive from Joseph Feconda, Administrator, the following procedures will be instituted.
 The following guidelines have been set forth:

| ITEMS | SPECIFICATIONS |
| --- | --- |
| Television Sets | 12" black & white or color all solid state Must have earplugs or headphones |
| Record Players | No detachable speakers (No console) All solid state Must have earplugs and headphones |
| Tape Players | 8 track only No detachable speakers |

They also required that Smith's possession be treated as a serious offense and that she should be immediately locked into segregation.

Smith admitted possessing the items found during the search but insisted that she didn't know that they were contraband. The Adjustment Committee found her guilty. Smith was assigned to indefinite segregation. Upon review, Smith's classification was changed by the Assignment Committee from minimum to maximum security because her "violation was very serious in nature." About a month later Smith appeared before the Adjustment Review Committee requesting that she be returned to her law library position. She was later informed that she had been assigned to the laundry. Smith declined to accept the laundry assignment until she could appear before the Assignment Committee.

Smith was not brought before the Assignment Committee as required by Administrative Regulation 802,[2] but instead was given a disciplinary ticket for "refusing a direct order."[3] On December 1, 1976, she was found guilty of that charge and continued in punitive segregation.

On January 6, 1977, Smith appeared before the Assignment Committee. She told the committee that she wanted her law library position back and would, out of principle, accept no other. On February 10, 1977, she was assigned to the utility crew. She refused the assignment, was given a disciplinary ticket, and continued in punitive segregation. On December 12, 1977, she was assigned to the hospital. She refused the assignment, was given another disciplinary ticket and continued in segregation.

All of the defendants agreed that no prisoner at Dwight had ever before been charged with a disciplinary offense or placed in segregation for possession of a camera or microphones and that several

| ITEMS | SPECIFICATIONS |
|---|---|
| | All solid state |
| | Must have earplugs or headphones |
| Combination Sets | Combination of record player and tape player will be allowed with the same specifications as noted above. |
| Radios | AM—FM only |
| | No short wave or marine bands |
| | No detachable speakers |
| | Must have earplugs or headphones |

In compliance with the above, we have three different sources of which electronic equipment will be made available. Literature, orders, and display will be at the residents commissary.
Effective August 1st, 1975, all electronic equipment will be ordered through these sources.
Resident who currently has electronic items will not be permitted to purchase like items until the old piece of equipment has been sent home. The program team will check with the control center before issuing approval for a new item.
Purchase requests must have approval of the Program Team and with purchase of the new equipment contracts will be approved through the control center in accordance with current procedure.
No one will be permitted to use this equipment without use of earphones....

2. Regulation 802(II)(C)(2) provides:
Permanent reassignment of a resident as a result of a rule violation can only be considered after the resident is adjudged guilty in accordance with the provisions of Administrative Regulation 804 and a recommendation for assignment change is made by the Adjustment Committee or Program Team. The full committee must make a majority determination on the change of the *resident afforded the opportunity to appear before and address the committee when his/her case is being considered.* (emphasis added).

3. Smith's "refusal" to take the laundry job is alleged to be in violation of Regulation 804(II)(H)(1)(b):
The following acts or actions by residents in adult correctional institutions and facilities of the Department of Corrections shall be considered violations of rules and/or regulations, with only those matters which the Line Staff or Program Team believe cannot be satisfactorily resolved through their own involvement to be referred to the attention of the Adjustment Committee for its consideration:

. . . . .

b. Refusing properly authorized work and/or housing assignments, carelessness or negligence of work, or refusal to work.

inmates had on prior occasions openly possessed and used them.

Smith was held in segregation for 22 and one-half months. For the first few weeks in segregation she had nothing but a bed, a dresser, a toilet and a sink. After six weeks she was allowed a change of clothes. She later was given her T.V., but not her toilet articles, radio or lamp.

Because of the unusually cold winter she put one of her blankets over the drafty window, blocking out all the sunlight. She kept another blanket over her head trying to stay warm. Her quarters were plagued with rodents and insects. She was locked in her cell nearly 24 hours per day. She lost 30–40 pounds.

## II. Proceedings in District Court

Smith filed this action on February 9, 1977, under section 1983 of the Civil Rights Act (42 U.S.C. § 1983), against the Director and other officers of the Dwight Correctional Center, seeking release from segregation, return of her law library position, restoration of her minimum security status, and compensatory and punitive damages. Defendants moved for summary judgment, which was granted by the district court. Smith appealed. On August 11, 1978, this court reversed the district court and held, in an unpublished order, that Smith had been unconstitutionally placed in segregation and that her punishment was illegal. It found that Bulletin # 44 "failed to state a disciplinary offense" and that 804(H)(1)(m) "was so vague that no prison inmate of reasonable intelligence could be expected to understand that a camera, film, and microphones were included as contraband under its provisions."

The court held that:

At the very least, it would seem that Smith should be released from segregation, reinstated to the security classification she held prior to her illegal segregation, and returned to her work assignment as an assistant prison librarian. In addition, it seems only equitable and just that the bad conduct report issued against her for violating 804(H)(1)(m) be expunged from her prison record, and

that any good time credits lost as a consequence of her segregation for violation of the regulation be restored.

After a hearing and a district court order, Smith, on September 15, 1978, was returned to minimum security status. On November 2, 1978, the Assignment Committee assigned her to the law library position and allowed her to return to a general population cell. Smith's good time was finally restored completely in May, 1979 after a second court order directing the defendants to do so.

The trial on damages began on June 20, 1983, over a year after Smith had been released on parole. The jury returned a verdict against former Director of Department of Corrections Charles Rowe, former Dwight Correctional Center Wardens John Platt and Charlotte Sutliff-Nesbitt, and former Assistant Warden Frank Deere, finding them liable for punishing Smith "for exercising one or more of her Constitutional rights, and/or to prevent her from further exercise of the same." The jury awarded Smith a total of $80,770 in compensatory damages, jointly and severally, against the four defendants, and $5,000 in punitive damages against each of them separately for a total of $20,000. The district court awarded $83,398.38 in attorneys' fees.

## III. Contentions on Appeal

The appellants contend on appeal:

(1) that the district court's exclusion of certain documents was a clear abuse of discretion;

(2) that Smith's intentional failure to take other job assignments, which resulted in her continued detention in segregation, amounted to failure to mitigate damages as a matter of law;

(3) that the compensatory damage award of over $80,000 was "monstrously excessive" and shocking, warranting a new trial or a substantial remittitur;

(4) that Smith did not establish a *prima facie* case against Rowe, the head of the Illinois Department of Corrections.

## IV. Exclusion of Certain Documents

At trial defendants attempted to introduce into evidence Information Bulletin # 44 and certain Adjustment Committee Summaries listed on Smith's pretrial submission, but not on the defendants'. The appellants claim that the documents relate to the central issue of the case, i.e., defendants' good faith defense that Smith was placed in segregation "to further the security and safety of the Dwight Correctional Center." When Smith objected, the court did not allow the documents into evidence, but permitted the defense witnesses to refer to and testify concerning the nonlisted documents. The appellants now argue that the court's ruling caused them substantial injustice which warrants the granting of a new trial under this court's decision in *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir.1982), *aff'd on other grounds*, —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

Fed.R.Civ.P. 16(e) provides that a pretrial order "controls the subsequent action of the parties, unless modified at trial to prevent manifest injustice." The trial court should consider four factors in determining whether to permit a party to vary from its pretrial submission:

(1) the prejudice or surprise in fact of the party against whom the proffered documents would have been submitted;

(2) the ability of the party to cure the prejudice;

(3) the extent to which waiver of the rule against admission of unlisted documents would disrupt the orderly and efficient trial of the case or of other cases in the court; and

(4) bad faith and willfulness in failing to comply with the court's order.

*Spray-Rite*, 684 F.2d at 1245. Because the documents were listed on Smith's pretrial submission, she cannot claim surprise or prejudice. We thus need examine only the last two factors to determine whether the district court abused its discretion in excluding the proffered documents.

On January 7, 1983, the court set May 10 as the final pretrial conference date. Defense counsel appeared on that date with no pretrial submission as required by the trial court's standing order. Defense counsel explained that the Attorney General's office had a lot of other cases to handle and that there was a lot of discovery in this case. The court found that this explanation did not excuse defense counsel's failure to give notice to the court so that the pretrial conference could be canceled, especially since plaintiff's lawyer had to come from Chicago.

Defense counsel appeared at the second pretrial conference with "some words on three or four legal-sized sheets of paper. It wasn't even typed." [4] Four documents were listed. The court informed defense counsel that he would be bound to those listed exhibits. Defense counsel did not move to supplement his list. [5] A few days before trial the final pretrial order was signed by defendants' counsel. It contained 88 stipulated facts; and a substantial number of them related to Bulletin # 44 or the contents of the Adjustment Committee Summaries which the defendants later offered in evidence. The stipulation of facts was read to the jury at the beginning of the trial.

Taking all this into consideration, the trial court concluded that "defense counsel had shown ... an absolute total indifference to the rules of this court." When the court was called upon to rule on the question of the admissibility of the unlisted documents the court felt compelled to rule against the defendants. This ruling was grounded on two concerns. The court stated, when ruling on the defendants' post trial motions, that to rule otherwise would have rewarded "the most blatant type of attorney ... lack of preparation [and] lack of performance...." Also the court be-

---

4. From comment of court at hearing on post-trial motions and attorneys' fees, October 27, 1983.

5. In addition, the court found shortly after the trial began that the defendants had never filed an answer.

lieved that "if [it] had not ruled that way, then [it] would have been giving up any claim to authority that [it] had over the way this case were to proceed." Even after attending the first pretrial conference unprepared and after receiving sanctions and warnings by the court, defense counsel arrived at the rescheduled conference again unprepared. Further, he made no effort to supplement his obviously inadequate pretrial submission. We agree with the district court that this behavior amounts to a "willfulness in failing to comply with the court's order." Also, given defense counsel's seeming indifference to the rules of the court, the trial court was justified in believing that to allow defense counsel to enter the documents into evidence would undermine the authority of the court, which would "disrupt the orderly and efficient trial of the case." *Spray-Rite*, 684 F.2d at 1245. We conclude that the trial court did not abuse its discretion in refusing to allow the unlisted documents into evidence, especially since the defense witnesses were allowed to refer to the documents during their testimony, and the Stipulation of Facts contained many references to Bulletin #44 and relevant contents of the Adjustment Committee Summaries. See Fed.R.Civ.P. 61.

The appellants claim that the trial court abused its discretion in ordering two sanctions for the same noncompliance. The court fined the defense attorney when he arrived at the first pretrial conference having neither prepared for the conference nor informed the court thereof so the conference could be postponed. Refusing to permit introduction of the unlisted documents into evidence was then, appellants claim, a second sanction.

The Federal Rules of Civil Procedure sets forth the sanctions if a party fails to obey the pretrial order or "if a party or party's attorney is substantially unprepared to participate in the conference." The judge may make "such *orders* with regard thereto as are just and among others any of the orders provided in Rules 37(b)(2)(B), (C), (D)." Fed.R.Civ.P. 16(f)

(emphasis added). Rule 37(b)(2)(B) empowers the court to prohibit the offending party from "introducing designated matters in evidence." Fed.R.Civ.P. 37(b)(2)(B).

The sanction rule allows whatever *orders* are appropriate. This implies that the court's sanction may include attorney's fees plus any other proper sanction. This interpretation is consistent with the language of Rule 37, which sets forth the sanctions for violations of discovery orders:

> In lieu of any of the foregoing orders *or in addition thereto*, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure....

Fed.R.Civ.P. 37(b)(2) (emphasis added).

## V. Mitigation of Damages

Appellants claim that Smith failed to mitigate her damages. They contend that by her refusal to take another job she increased her time in segregation, thereby increasing her injury. Citing the Second Restatement of Torts, appellants argue that a plaintiff is not entitled to recover damages if "the injured person with knowledge of the danger of harm intentionally or heedlessly failed to protect his own interest." Restatement (Second) of Torts § 918(2) (1977). They conclude that because Smith "intentionally and heedlessly" chose to remain in segregation there was no question of fact for the jury. The court should have ruled as a matter of law that Smith could not recover for the segregation time which resulted from her refusal to take another job.

The district court ruled that the issue of mitigation was a question of reasonableness for the jury to determine. The mitigation instruction given to the jury read:

> To the extent, if any, plaintiff could have prevented any injury by taking reasonable actions under the circumstances, you should not award damages for that injury.

Although an issue of first impression in the Seventh Circuit, this instruction accurately states the position on mitigation of

damages in the Third, Fourth, Fifth, Eighth, and District of Columbia Circuits. Each views the issue as a question of fact for the jury. *See Miller v. Apts. and Homes of N.J., Inc.,* 646 F.2d 101, 112 (3d Cir.1981) (42 U.S.C. § 1982 action in a housing discrimination case in which plaintiff rented a substitute apartment); *Williams v. Albemarle City Board of Education,* 508 F.2d 1242, 1243 (4th Cir.1974) (discharged or demoted teacher refused alternative employment); *Claiborne v. Ill. Cent. R.R.,* 583 F.2d 143, 153 (5th Cir.1978), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979) (Title VII action in which plaintiff did not accept offer of reinstatement); *Dickerson v. Deluxe Check Printers, Inc.,* 703 F.2d 276, 282 (8th Cir. 1983) (in an age discrimination case plaintiff refused subsequent offers of reinstatement); *Tatum v. Morton,* 562 F.2d 1279, 1282–84 (D.C.Cir.1977) (plaintiffs arrested during a Quaker vigil refused to post $10 collateral which would have resulted in their release).

It is true, as appellants note, that there are few cases which discuss a prisoner's duty to mitigate damages. Of the cases listed above, *Tatum v. Morton* is the only one involving an inmate of a jail or correctional institution. In addition, appellants cite *Whirl v. Kern,* 407 F.2d 781 (5th Cir. 1968), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). Neither of these two cases is precisely in point, but both tend to support appellee's position.

The plaintiffs in *Tatum* were participants in a peaceful prayer vigil protesting United States policy in Vietnam. When arrested for refusing to disperse, several protestors refused to post a $10.00 bond, electing to stay in jail, believing that "their arrests were unjustified and that posting collateral would somehow give an air of legitimacy to their arrests." The district court awarded limited damages, but refused to award damages for the time they were incarcerated subsequent to their refusal to post bond. The court of appeals rejected the trial court's imposition of an absolute duty to mitigate, holding that "the problem is one of reasonableness" and that

it "is not unreasonable for a plaintiff who has been arrested wholly without cause to insist that the process that is due him must include provisions for reasonably prompt review of the situation by responsible persons in the criminal justice system other than the police...." *Tatum,* 562 F.2d at 1283–84.

In *Whirl v. Kern,* an action against the sheriff for deprivation of civil rights under 42 U.S.C. § 1983, Whirl had been held in jail for nine months after the charges against him were dismissed. Apparently neither Whirl nor the sheriff had been apprised of the dismissal. In reversing a judgment for the defendant on a jury verdict, the court of appeals held, *inter alia,* that Whirl had no duty to mitigate his damages, because he did not have a duty to discover the dismissal of the charges against him, and the instruction on contributory negligence was therefore error. *Whirl,* 407 F.2d at 797.

*Whirl* does not support appellants' claim that the court should have determined as a matter of law whether Smith's actions were "intentional or heedless." The court in *Whirl* only determined whether there was a duty to mitigate damages. It is implicit in the court's holding that if there had been a duty, the determination of whether Whirl's conduct was intentional or heedless would have been properly submitted to the jury.

We agree with Judge Leventhal's conclusion in *Tatum* that the duty to mitigate is not absolute and that the "problem is one of reasonableness." Whether Smith's actions were reasonable was a question of fact for the jury.

Smith was convinced that she was right and that she was being deprived of her constitutional rights. She refused the assignments to the laundry and utility room as a "matter of principle," insisting that she should be reassigned to her position as law librarian. On her first appeal this court, in its unpublished order, agreed, holding that Smith had been unconstitutionally placed in segregation, that her punish-

ment was illegal, and that she should be released from segregation and returned to her work assignment as an assistant prison librarian. It was not unreasonable for the jury to find that Smith's actions were reasonable under the circumstances of this case.

## VI. Amount of the Award

 Appellants contend that assuming *arguendo* that the jury could consider Smith's entire stay in segregation, the award of $80,000 in compensatory damages was "monstrously excessive and shocking, warranting a new trial or a substantial remittitur."

"Damages assessed by a jury are largely discretionary with it." *Galard v. Johnson*, 504 F.2d 1198, 1200 (7th Cir.1974). A motion for a new trial on the ground of excessive verdict is addressed to the discretion of the trial court. To reverse the judgment of the trial court, the appellate court must conclude that the verdict was so "gross" or "monstrously excessive" that the trial court abused its discretion in permitting it to stand. *Id.* at 1199. *See also Huff v. White Motor Corp.*, 609 F.2d 286, 297, (7th Cir.1979), where we held that the verdict may not be set aside unless it can "aptly be described as 'grossly excessive' or 'monstrous.'" [6] In making this determination the appellate court must make a detailed appraisal of the evidence bearing on damages, *Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968), to determine "whether the amount is so high that it would be a denial of justice to permit it to stand." *Dagnello v. Long Island R.R. Co.*, 289 F.2d at 806, (quoted with approval in *Galard v. Johnson*, 504 F.2d at 1200).

 In making its assessment of the amount of the damages the jury was instructed to consider: (1) the nature, extent and duration of the injury to the plaintiff; (2) general pain and suffering; (3) humilia-

tion; (4) mental distress, and (5) the violation of constitutional rights. As indicated by the trial court in considering appellants' post trial motions, it is difficult to ascertain the dollar amount the jury awarded for each factor. Like the trial court, we do not, considering the circumstances of this case, find $80,770 to be a shocking award.

From our independent appraisal of the evidence we find that the jury verdict is supported by the record. Smith spent 22 and one-half months in punitive segregation, where she was confined almost 24 hours a day. It was six weeks before she was given a change of clothing. During the frigid winter days a blanket was used to block the light from the drafty windows. She lost between 30 and 40 pounds. In addition to the physical discomforts, there is no question that Smith suffered substantial mental anguish, humiliation, and degradation. She lost other privileges. She could not, while in segregation, earn good time and her possibility of parole was affected.

The damage award in this case amounts to about $119 per day of segregation. This court has upheld greater per day awards for segregation confinement. *See, e.g., Mary and Crystal v. Ramsden*, 635 F.2d 590, 593 (7th Cir.1980) ($212 per day); *Saxner v. Benson*, 727 F.2d 669, 672–73 (7th Cir.1984) ($129 per day). In comparison, Smith's award is neither monstrously excessive nor shocking.

## VII. Prima Facie Case Against Rowe

Rowe, the Director of the Illinois Department of Corrections, contends that Smith did not make out a *prima facie* case against him. He claims that Smith failed to show his personal involvement. Based on this contention he moved for a Judgment Notwithstanding the Verdict. The district court denied his motion.

This court, in *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir.1982), explained the per-

---

**6.** In *Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156 n. 4, 89 S.Ct. 331 n. 4, 21 L.Ed.2d 309 (1968), the Supreme Court noted that the standard had been "variously phrased," quoting from *Dagnello v. Long Island R.R. Co.*, 289 F.2d

797, 802 (2d Cir.1961): "Common phrases are such as: 'grossly excessive,' 'inordinate,' 'shocking to the judicial conscience,' 'outrageously excessive,' 'so large as to shock the conscience of the court,' 'monstrous,' and many others."

sonal involvement requirements of a section 1983 action:

> To recover for damages under 42 U.S.C. § 1983, a plaintiff must establish defendant's personal responsibility for the claimed deprivation of a constitutional right. *Duncan v. Duckworth,* 644 F.2d 653, 655 (7th Cir.1981). However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.

In *Wolf-Lillie v. Sonquist,* 699 F.2d 864 (7th Cir.1983), the court considered the section 1983 liability of a sheriff for the damages caused by the execution by his deputies of an outdated writ of restitution. We began our analysis by noting that in order for a supervisory official to be found liable there must be "[a] causal connection, or an affirmative link, between the misconduct complained of and the official sued...." *Id.* at 869. (citing *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)). The evidence revealed that the sheriff's department made it a common practice to execute outdated writs of restitution. In a two year period over half of the writs executed were outdated. The record showed that the sheriff was aware of this policy. We concluded that the requisite affirmative link was present and found the sheriff liable. *Id.* at 870.

We now review the evidence in this case in the light of *Crowder* and *Wolf-Lillie* to determine whether there is support for a finding of an affirmative link between Rowe and Smith's continued punitive segregation. The chief civilian librarian of the law library wrote to Rowe informing him of Smith's case in great detail and urged that he intervene to remedy Smith's mistreatment. Rowe did nothing. United States Congressman Ralph H. Metcalf wrote to Rowe asking him to intervene.

Rowe wrote a detailed response which revealed an intimate knowledge of the case. In the letter he ratified and adopted the actions of his subordinates.

Rowe testified in a deposition that he had discussed Smith's situation with Warden Sutliff-Nesbitt on a number of occasions. Warden Sutliff-Nesbitt indicated that she did not intend to reassign Smith to the law library. Rowe concurred each time in the warden's intended actions. Rowe also admitted that refusal of a work assignment was a relatively minor offense which usually carried a maximum sentence of 15 days of segregation.

Like the sheriff in *Wolf-Lillie,* Rowe knew of the actions of his subordinates which resulted in a constitutional violation. Also, both failed to take any preventive action. We are satisfied that there is the requisite affirmative link between Rowe and Smith's continued segregation. We conclude that Smith made out a *prima facie* case, and the district court did not err in denying Rowe's JNOV motion.

## VIII. Conclusion

We conclude that (1) the district court did not abuse its discretion in excluding Information Bulletin # 44 and the Adjustment-Committee Summaries; (2) Smith's failure to take other job assignments, which resulted in her continued detention in punitive segregation, did not, under the circumstances, amount to a failure to mitigate damages as a matter of law; (3) the award of compensatory damages in the amount of $80,770 was not "monstrously excessive" and shocking and did not require a new trial or a remittitur; and (4) Smith established a *prima facie* case against Charles Rowe, the Director of the Illinois Department of Corrections.

Finding no reversible error, the judgment of the district court is affirmed.

AFFIRMED.