Victor RIOS, Plaintiff-Appellant,

v.

Michael P. LANE, et al.,
Defendants-Appellees.

No. 85–3205.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1986.

Decided Feb. 13, 1987.

Gregory L. Padgett, Kirkland & Ellis, Chicago, Ill., for plaintiff-appellant.

Rita M. Novak, Illinois Atty. Gen. Office, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

The issues presented for review on this appeal center upon the first and fourteenth amendment rights of those incarcerated in this country's prisons. Victor Rios ("Rios") the plaintiff-appellant, filed a civil rights action against defendants-appellees Douglas Wombacher ("Wombacher"), Judson Childs ("Childs"), James Thieret ("Thieret"), Salvador Godinez ("Godinez"), Richard DeRobertis ("DeRobertis"), and Michael Lane ("Lane") concerning an incident which occurred while Rios was an inmate at Graham Correctional Center ("Graham"). Rios alleged, *inter alia*, that the defendants violated 42 U.S.C. § 1983 by depriving him of his first amendment right to free speech and his fourteenth amendment due process rights. The district court granted the defendants' motion for summary judgment which Rios now appeals. We reverse the order of the district court for the reasons set forth below.

### I.

Victor Rios is an Hispanic American formerly imprisoned at Graham Correctional Center in Illinois. While in Graham on February 4, 1983, Rios became acquainted with fellow inmate Adolfo Matos. Matos had recently been transferred to Graham and asked Rios for information concerning Spanish radio programs that could be received at the prison. Subsequently, on February 18, 1983, Rios encountered Matos in the Graham dining area during breakfast. Rios handed Matos a 3″ × 5″ note card containing the following message:

HASTA LA VICTORIA SIEMPRE ["Until the victory forever"]. Radio Venceremos from El Salvador's FMLN transmits on two frequencies near 700kHz. Because of the condition under which they are working, the signal is not nearly as strong as that of major international broadcasters, making reception on an inexpensive set difficult. Since last March, the transmissions have been jammed frequently. Press reports indicate the jamming is coming from U.S. warships stationed in the Gulf of Fonesca. Due to the jamming, Radio Venceremos changes frequencies often. In recent weeks it has been on 6.952. The best reception is at night. Nicaragua vencio, Guatemala vencera, El Salvador la sequira! ["Nicaragua won, Guatemala will win, El Salvador will follow"!]

The other side of the card contained a list of four Spanish radio stations with a schedule of broadcast times and frequencies, including: Radio Havana, Voice of Nicaragua, Radio Free Grenada and Radio Venceremos. Also listed was the slogan, "Viva Puerto Libre Y Sociolista!" ["Long live Puerto [Rico] free and socialist!"].

Defendant Wombacher, a Correctional Captain at Graham who was responsible for monitoring inmates during breakfast, witnessed Rios hand Matos the card. Though Wombacher examined the card in the dining room, he was unable to understand its contents and returned it to Matos. Sometime later, Wombacher confiscated the card from Matos and had its Spanish slogans translated to English. After meeting with defendant Childs, the Chief of Security, and defendant Thieret, the Warden of Graham, Wombacher issued an Inmate Disciplinary Report ("IDR") against Rios.

The IDR was issued against Rios for engaging in gang activity in violation of Administration Regulation 804, Rule 205. Rule 205 defines "Gang Activity" as "engaging or pressuring others to engage in gang activities or meetings, displaying, wearing or using gang insignia, or giving gang signals." Wombacher reported that the IDR was issued because he believed that Rios' action constituted "an attempt by Inmate Rios to encourage others to participate in organized gang activities."

In a memorandum addressed to Deputy Director Meyer, Warden Thieret's immediate supervisor, Thieret explained the rationale for issuing an IDR against Rios:

As a result of the information on this paper, the fact that Inmate Matos is a self-confessed member of the FALN, an Inmate Disciplinary Report was issued to Inmate Rios citing Administrative Regulation 804, rule violation #205, "Gang Activity." The rationale for this ticket was the connection or possible connection between the FALN and the FMLN, and what was our opinion that Inmate Rios was providing Inmate Matos with organizational material which could be utilized in the recruitment of additional members into the FALN from the Graham Correctional Center population.

At his disciplinary hearing before the Adjustment Committee, Rios told the investigator that the card merely contained a schedule of Spanish-speaking stations, information which he had obtained from a magazine called *The Militant*, a socialist newspaper which had been approved by the Graham administration for Rios to receive. Rios also explained that the FMLN was not affiliated with the FALN and that the "Viva Puerto Rico" slogan was not an FALN slogan, but the slogan of a legitimate political party in Puerto Rico. Rios requested the Adjustment Committee to verify the radio stations. Additionally, he noted that the term "FALN" did not appear on the card. Based on the evidence before it, the Committee found that Rios violated Rule 205. Rios was demoted and transferred to Stateville prison, a maximum security institution. Thieret approved the Committee's finding of guilt and the punishment it imposed.

After his transfer, Rios appealed the decision of the Adjustment Committee to the Illinois Department of Correction's ("IDOC") Administrative Review Board. Rios was interviewed by the Board and told them that the card contained radio frequencies that "he had given to the other inmates who had inquired about the availability of Spanish music and news." He further stated that he was not an FALN member. The Board also considered the disciplinary report of Wombacher and the record of proceedings before the Adjustment Committee, as well as Rios' history at Graham which included four minor disciplinary reports during his 20-month stay. Based upon all the evidence, the Board recommended that the disciplinary report be upheld. The Board stated, "After reviewing the information that has been provided, the Panel is of the opinion that the list of radio frequencies and broadcasts as listed on the documentation constitute gang activity." Defendant Lane, the Director of the Department of Corrections, approved the Board's recommendation.

Rios subsequently made three requests for a transfer from Stateville which were denied. The rationale for the denials was Rios' recent failure to adjust at the medium security facility, Graham. Defendant Godinez, the Assistant Warden of Programs at Stateville, was the chairperson of one of the committees which denied Rios' request. Defendant DeRobertis was the Warden of Stateville and approved each of the denials.

Ultimately, Rios filed a five count complaint in federal district court. Upon the defendants' motion for summary judgment, Judge McGarr dismissed the plaintiff's action in its entirety, a decision from which Rios now seeks our review. Initially, Rios challenges his punishment for communicating the aforementioned information as a violation of his first amendment right of free speech. Next, Rios contends that the "gang rule" pursuant to which he was punished is overbroad and vague and thus failed to adequately notify him of prohibited conduct in violation of his fourteenth amendment right to due process. Finally, the defendants maintain that even if Rios' first and fourteenth amendment rights were violated, they are entitled to qualified immunity because they acted reasonably in an area of law which was not well settled.

## II.

As is almost universally recognized, a prisoner is not stripped of all first amendment rights incident to internment. Rather, he "retains those first amendment

rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *see also Bell v. Wolfish*, 441 U.S. 520, 544, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *French v. Heyne*, 547 F.2d 994, 1000 (7th Cir.1976); *but see Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir.1986) (questioning whether inmates retain any first amendment rights). At issue here is whether Rios retained the right to express the aforementioned information in the context of his prison environment.

In approaching this inquiry we believe that the intermediate scrutiny standard expressed in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) controls. We reject the government's assertions that the more permissive "reasonableness" standard applied in *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), is the appropriate criterion for judging the defendants' conduct.

As has been noted frequently, *Jones* involved inmates' associational rights and by its own terms only "barely implicated" the "free speech guarantees of the First Amendment." *Id.* at 130, 97 S.Ct. at 2540. *See, e.g., Safley v. Turner*, 777 F.2d 1307, 1311 (8th Cir.1985); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1031 (2d Cir.1985); *Trapnell v. Riggsby*, 622 F.2d 290, 293 (7th Cir.1980). In *Jones*, the court indicated that it is a prisoner's associational rights which are most severely and necessarily limited by the realities of confinement. *Jones*, 433 U.S. at 125–26, 97 S.Ct. at 2537–38. Thus, the Court concluded that prison officials could properly forbid inmate-to-inmate solicitation for prison union membership, as well as prohibit group activity of the union, without an affirmative showing by prison officials that a prisoners' union would be "detrimental to proper penological objectives." *Id.* at 128, 97 S.Ct. at 2539. Rather, the Court held that the burden was upon prisoners to demonstrate that correc-

tions officials were "conclusively" wrong in their determination that a prisoners' union was inimical to the orderly maintenance of the prison environment. *Id.* at 132, 97 S.Ct. at 2541.

The government's attempt to analogize the present case to *Jones* and thus adopt its more permissive standards is an unwarranted oversimplification. *Jones* centered upon the viability of a functioning prisoners' union involving active membership solicitation among inmates. Based upon the severely restricted associational rights retained by prison inmates and the Court's concern with the special dangers inherent in concerted group activity by prisoners, an extremely permissive and deferential criterion was employed in judging the conduct of prison authorities.

While some similarities may exist, unlike *Jones*, the present case directly implicates the appellant's right to free speech. Obviously no one argues for the viability of prison gangs, indeed, associational rights are what is "barely implicated" here. Instead, Rios claims that his free speech rights were unduly trammelled in an attempt to prevent gang activity. Though the solicitation for union membership involved in *Jones* was indeed speech, it was incidental to the existence of the Union itself. "As the Court recognized there, [i]f ... prison officials are otherwise entitled to control organized union activity within the prison walls, the prohibition on solicitation for such activity is not then made impermissible on account of First Amendment considerations...." *Jones*, 433 U.S. at 132, 97 S.Ct. at 2541. Here Rios claims a deprivation of what he believes is his first amendment right to communicate political information totally independent of any associational rights. *See Safley v. Turner*, 777 F.2d at 1311; *Abdul Wali v. Coughlin*, 754 F.2d at 1031; *Buise v. Hudkins*, 584 F.2d 223, 230 (7th Cir.1978).

Hence, where speech rather than associational rights are involved, the more rigorous standard set forth in *Martinez* is applicable. *Martinez* requires that prison officials demonstrate an important or substantial governmental interest furthered by the

challenged regulation which is unrelated to the suppression of expression. Moreover, the restrictions placed on an inmate's first amendment rights must be no greater than is necessary to protect the governmental interest involved. *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811; *Aikens v. Jenkins,* 534 F.2d 751, 755 (7th Cir.1976). The regulation at issue here, Administration Regulation 804, Rule 205, prohibits inmates from "engaging or pressuring others to engage in gang activities or meetings, displaying, wearing or using gang insignia, or giving gang signals."

The governmental interest furthered by Rule 205 clearly involves a central tenet of any prison administration which requires above all else that security, order, and discipline be maintained in what is obviously a volatile and potentially dangerous environment. *See Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804; *Procunier v. Martinez,* 416 U.S. at 412, 94 S.Ct. at 1810. Equally compelling and inexorably related is the need to contain and eliminate prison gangs wherever possible. Indeed, it is difficult to conceive of a single factor more detrimental to penological objectives than organized gang activity.

The more difficult task however, is not in identifying an important governmental interest at stake, rather it is in determining whether the enforcement of Rule 205 was no greater an infringement upon Rios' first amendment liberties than necessary to protect the state's interest. In this regard, however, we are guided by the Supreme Court's frequent admonition that particular deference and latitude be given prison officials. *See, e.g., Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878 ("[p]rison administrators ... should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *Jones,* 433 U.S. at 125, 128, 97 S.Ct. at 2537–39; *Pell,* 417 U.S. at 825–26, 94 S.Ct. at 2805; *Martinez,* 416 U.S. at 414, 94 S.Ct. at 1811. Moreover, as recognized by the district court below, Rios' expression cannot be divorced from the factual context in which it was exercised. It is well known that because of their avowed use of violent and illegal means in achieving their objectives, FALN members pose a heightened and serious threat to prison security.

■ Inmate Matos, to whom Rios passed the note card, is a known member of the FALN and was subject to close supervision by prison officials. Although Rios maintains that neither he nor the FMLN organization inscribed on the note card are associated with the violent pursuits of the FALN, Rios' attempted association with a known FALN member legitimately subjected him to increased observation by prison officials. Additionally, unlike mail censorship cases, the heightened volatility inherent in direct person-to-person interaction only serves to increase the discretion afforded prison administrators. *Cf. Jones,* 433 U.S. at 131–32, 97 S.Ct. at 2540–41.

■ While Rios' message did contain a significant element of political speech, we do not believe he was punished solely because of his personal views. Nor do we believe that prison officials unduly restrained his free speech rights in attempting to enforce Rule 205. Prison officials properly acted upon the probable consequences of the situation which confronted them. As the Supreme Court recognized in *Martinez,* prison administrators are not required to "show with certainty that adverse consequences would follow from a failure to [act]." *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811. Rather, they are to be given "[s]ome latitude in anticipating the probable consequences of allowing certain speech in a prison environment...." *Id.* That latitude was not exceeded under these circumstances.

### III.

■ In addition to his first amendment claim, Rios challenges the imposition of sanctions against him as a violation of his fourteenth amendment due process rights. Specifically, Rios argues that Rule 205 is unconstitutionally vague and thus failed to

give him adequate notice of prohibited conduct.

It is a fundamental precept of constitutional law, as well as "ordinary notions of fair play" that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939); *Bence v. Breier*, 501 F.2d 1185, 1188 (7th Cir.1974). Moreover, where prohibited conduct does not carry with it its own indicia of wrongdoing the need for clearly drawn prison regulations is particularly acute. *See Adams v. Gunnell*, 729 F.2d 362, 369 (5th Cir.1984); *Meyers v. Alldredge*, 492 F.2d 296, 311 (3rd Cir.1974); *see also Smith v. Rowe*, 761 F.2d 360, 364 (7th Cir.1985) (holding that no inmate of reasonable intelligence could be expected to understand that a camera, film, and microphones were included as contraband under prison regulation).

In *Adams v. Gunnell*, the plaintiffs were punished under a "disruptive conduct" statute for signing and circulating a petition complaining of discrimination against black inmates by prison officials. *Id.* at 364–65, 368. However, some of these same plaintiffs had previously signed similar petitions without sanctions or other adverse consequences. *Id.* at 369. The Fifth Circuit held that the regulation was impermissibly vague as applied to the plaintiff inmates. The court reasoned that "[p]erhaps these inmates could have anticipated that the prison administration might disagree with the contents of the petition or resent its dissemination outside the institution. They could not have known, however, that serious disciplinary sanctions would be imposed for their conduct." *Id.*

The present case bears a clear resemblance to *Adams*. It is undisputed that much of Rios' message was gleaned from a newspaper called *The Militant*, a publication explicitly authorized by prison officials. Therefore, as in *Adams*, Rios could reasonably assume that what was permissible in one instance would not subject him to serious disciplinary sanctions in another. It could hardly be anticipated that the simple transcription of previously authorized information onto a note card would somehow cast its scrivener upon Jonah's leviathanian voyage. As the Supreme Court noted in *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972), "the root of the vagueness doctrine is a rough idea of fairness." *See also Bence v. Breier*, 501 F.2d at 1185, 1189. We believe that as applied to Rios, Rule 205 failed to approximate the parameters of fairness.

Unlike the inmates in *Meyers v. Alldridge*, 492 F.2d 296 (3d Cir.1974), upon which the government chiefly relies, Rios was given no prior warning that his conduct might be proscribed by Rule 205. Indeed, aside from the sparse text of the Rule itself, no material whatsoever was available to Rios describing what conduct was prohibited by the Rule. In *Meyers*, the plaintiff inmates were directly warned by their prison warden that they could be punished for failing to carry out their grievance committee duties in good faith. *Id.* at 310–11. Though the *Meyers* court recognized that due process requirements might be less stringently applied when judging prison regulations, it is obvious that the notice afforded Rios fell far short of that minimum accepted by the *Meyers* court. *See also Hadden v. Howard*, 713 F.2d 1003, 1008 (3rd Cir.1983) ("[inmate] was on notice that lying to an employee and showing insolence or disrespect toward a staff member were punishable misconduct [therefore he was also on notice that] filing a maliciously untrue complaint fell within those categories.")

Finally, the government urges upon us a restricted application of due process safeguards based on this court's decision in *Ustrak v. Fairman*, 781 F.2d 573 (7th Cir. 1986). There, we indicated that "the concepts of 'overbreadth' and 'vagueness' in the jurisprudence of the First Amendment

were devised in order to prevent the slightest discouragement of free speech, and therefore have only limited relevance to a sphere where the right of free speech is limited." *Id.* at 580. However, Rios' due process claim is completely distinguishable from and not dependent upon any free speech considerations. While the rationale of *Ustrak* may justify a restriction upon inmates'. free speech rights, it does not detract from the continuing requirement that inmates be free to steer away from prohibited conduct, unentangled by the trappings of poorly delineated prison regulations. *See Grayned v. City of Rockford,* 408 U.S. at 108, 92 S.Ct. at 2298.

## IV.

We turn now to the defendants' claims of qualified immunity. Government officials exercising discretionary functions are generally shielded from individual liability provided their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986); *Egger v. Phillips,* 710 F.2d 292, 315 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). Hence, we must determine whether a reasonable person would have known that Rios' punishment in 1983 was a violation of his due process rights.

It cannot be seriously contended that prison officials were unaware in 1983 that inmates retained a variety of important constitutional rights including due process guarantees. *See Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1975); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Contrary to the appellant's contention, however, that alone will not suffice to demonstrate a clearly established constitutional right. *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985); *Coleman v. Frantz,* 754 F.2d 719, 730 n. 15 (7th Cir.1985). Rather, the "right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez,* 795 F.2d at 1301. However, we believe that an inmate's right to adequate notice of prohibited conduct prior to the imposition of serious disciplinary sanction was sufficiently particularized in 1983 to put the defendants on notice that their conduct was probably unlawful.

It had long been recognized that due process requires advance warning and sufficient delineation of prohibited conduct prior to the imposition of disciplinary sanctions. *Grayned v. City of Rockford,* 408 U.S. at 108–09, 92 S.Ct. at 2298–99; *Connally v. General Constr. Co.,* 269 U.S. at 391, 46 S.Ct. at 127; *Bence v. Breier,* 501 F.2d at 1188. Moreover, it had been established repeatedly that prison inmates retain due process protections. *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *see also Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (prisoners retain religious freedom under first and fourteenth amendments); *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (retained right of access to the courts); *Lee v. Washington,* 390 U.S. 333, 92 S.Ct. 250, 30 L.Ed.2d 142 (1968) (equal protection rights retained).

While some case law prior to 1983 recognized a less rigorous application of due process guarantees in evaluating prison regulations, *see, e.g., Meyers v. Alldridge,* 492 F.2d 296 (3rd Cir.1974); *Landman v. Royster,* 333 F.Supp. 621, 656 (E.D.Va. 1971), those cases are clearly distinguishable on their facts and far from sanction the defendants' conduct here. Nor could they reasonably be interpreted as such. Indeed, those very cases continued to recognize the requirement that adequate notice be given inmates prior to discipline for prohibited conduct.

Additionally, the defendants were or should have been aware of a 1975

case to which other Illinois Department of Corrections ("IDOC") officials were a party. *Smith v. Rowe,* 761 F.2d 360 (7th Cir. 1985).[1] There, IDOC officials were held to have violated an inmate's constitutional rights by punishing her pursuant to a disciplinary rule that " 'was so vague that no prison inmate of reasonable intelligence could be expected to understand that the plaintiff's conduct was prohibited under [the rule's] provisions.' " *Id.* at 364. Government officials are charged with not only a knowledge of general legal principles but also their application in similar or analogous circumstances. *See, e.g., Williams v. Bennett,* 689 F.2d 1370, 1381–82 (11th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); *Anderson v. Central Point School District No. 6,* 554 F.Supp. 600 (D.Or.1982), *aff'd. in part and remanded,* 746 F.2d 505 (9th Cir.1984). We conclude that the present situation is indeed analogous to *Smith* and thus, the defendants are not entitled to qualified immunity. However, we find that defendant Wombacher is not liable to Rios. It is clear that Wombacher merely responded to the immediate concerns of prison security and ultimately cannot be said to have been responsible for the impositions of sanctions against Rios.

For the foregoing reasons the order of the district court is

REVERSED AND REMANDED.

---

**1.** To the extent that discussion of the effect of this Court's 1978 ruling in *Smith v. Rowe,* 588 F.2d 832 (7th Cir.1978), might be considered citation or use of an unpublished decision as precedent, its limited use is consistent with Circuit Rule 35(b)(2)(iv), authorizing use of such decisions "to support a claim of *res judicata,* collateral estoppel or law of the case."