**Alnoraindus BURTON, Plaintiff,**

v.

**John KUCHEL, et al., Defendants.**

**No. 93 C 1472.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 14, 1994.

Mark A. Casciari, Brent I. Clark and Jeffery S. Norman, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for plaintiff.

Roland W. Burris, Atty. Gen. of Illinois, Gary M. Griffin, and Phillip J. Robertson, Asst. Attys. Gen., for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Former Stateville Correctional Center ("Stateville") inmate Alnoraindus Burton ("Burton") brings this action under 42 U.S.C. § 1983 ("Section 1983"), contending that a number of Illinois Department of Corrections ("Department") employees violated his constitutional rights in the ways described in four counts bearing these Roman numerals and labels:

I.    Retaliation for Exercise of First Amendment Rights;

II.  Excessive Force;

III.  Invasion of Privacy;  and

IV.  Violations of Freedom of Speech, Right to an Attorney, and Right of Access to Courts.

All five remaining defendants now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, their motion is granted in part and denied in part.

### Procedural Background

Burton filed his initial complaint pro se, describing how he had assertedly been harassed, antagonized and on one occasion punched by various Stateville personnel. After this Court conducted its invariable threshold review for non-"frivolousness" in the legal sense defined in *Neitzke v. Williams,* 490 U.S. 319, 324, 109 S.Ct. 1827, 1831, 104 L.Ed.2d 338 (1989) and refined in *Denton v. Hernandez,* —— U.S. ——, —— ——, 112 S.Ct. 1728, 1733–34, 118 L.Ed.2d 340 (1992), it appointed counsel to represent Burton and granted leave to file an Amended Complaint ("AC") that set out the earlier-described claims. Burton had originally named these nine Stateville employees as defendants:

Warden Salvador Godinez ("Godinez")

Assistant Warden Jerome Springborn ("Springborn")

Lieutenant Vincent Currie ("Currie")

Lieutenant Paul Douglas Buchanan ("Buchanan")

Lieutenant Paul Arthur Morgan ("Morgan")

Correctional Officer ("CO") John Kuchel ("Kuchel")

CO Christopher Simpson ("Simpson")

CO Glenn Ray Malone ("Malone")

CO Dorothy Sims ("Sims")

After the taking of depositions, however, Burton voluntarily dismissed Springborn, Morgan and Sims on March 21, 1994.

### Summary Judgment Principles

Familiar Rule 56(c) principles teach that to be "entitled to a judgment as a matter of law," the moving party must establish the absence of any "genuine issue as to any material fact" (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In that respect, a "genuine issue" requires that there be sufficient evidence for a jury to return a verdict in favor of the nonmoving party (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)), while a "material fact" is one that "might affect the outcome of the suit under the governing law" (*id.* at 248, 106 S.Ct. at 2510; *Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991)). For that purpose, "[i]f the prison administrators and guards demonstrate[ ] that there are no genuine issues of material fact, [plaintiff] cannot rely on conclusory allegations; instead, he must provide evidence of specific factual disputes" (*Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988)). In applying those principles this Court is not required to draw "every conceivable inference from the record—only those inferences that are reasonable" in favor of nonmovant Burton (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991)).

Both sides have complied with the requirements of this District Court's General Rule ("GR") 12(m) and 12(n), adopted to implement Rule 56 by highlighting the existence or nonexistence of material factual issues. Because Burton is entitled to the benefit of favorable inferences, it turns out that only his GR 12(n) submission of added facts (cited "P. ¶ —") needs to be referred to in this opinion.

### Facts [1]

Burton was sent to Stateville on July 31, 1991 following a conviction on criminal charges. He arrived accompanied by a file containing a harsh appraisal written by the Assistant State's Attorney (P. 12(n)(2) ¶¶ 45–47; P.Ex. 3):

---

**1.** What follows in the text is not of course a set of this Court's factual findings, but rather a scenario that credits the pro-Burton evidence with the required reasonable inferences. Hence the account omits such qualifying terms as "allegedly" or "Burton claims" or the like.

[Burton] is evil personified. Every day of the rest of his life in prison should be made most difficult.

Although he has since been transferred (over his objections) to Menard Correctional Center, Burton was incarcerated at Stateville throughout the time period at issue here.

Burton's troubles giving rise to this lawsuit began on November 26, 1992 when he was on his way from the shower back to his cell. Burton (an African–American) accidentally bumped into Kuchel, who said, "Watch where you're going, nigger." Burton told Kuchel (who is white) to refer to him by his name or prison identification number, to which Kuchel responded, "I'll call you what I want to call you, nigger" and then pushed Burton against the wall (Burton Dep. 19–21).[2] Lieutenant Morgan arrived on the scene about that time, at which point Kuchel walked away.[3] After Burton asked Morgan whether he had heard Kuchel's slur, Morgan called Kuchel back to inquire, but Kuchel denied calling Burton "nigger" and walked away smirking (P. 12(n)(2) ¶¶ 54–55; Burton Dep. 21).

Though Morgan instructed him "just leave the incident alone," (P. 12(n)(2) ¶ 55; Burton Dep. 24), Burton decided to pursue the matter further.[4] He brought it to the attention of CO Bobby Timms, who referred him to Captain Raymond Hall ("Hall"). During dinner that night Burton took his story to Hall, who summoned Kuchel to his office for questioning and advised Burton to write up a grievance (P. 12(n)(2) ¶¶ 56–58). Burton both did that and also wrote to Godinez asking to be placed on the call line to speak directly with the Warden or an Assistant Warden (id. ¶ 59).[5]

As Burton was returning from Hall's office to dinner, Kuchel approached him, called him a "trick" (a derogatory term for a prisoner who complains of mistreatment) and warned him "that it's not over yet" (Burton Dep. 33).[6] Three days later (on November 29) Kuchel, Morgan and Simpson executed the first of what was to become a series of inordinately frequent "shakedowns" over the next month.[7] Those shakedowns, ostensibly conducted to search Burton's cell for contraband, occurred three or four times a week (Burton Dep. 37–42, 93 ("just about every day")) and were usually accompanied by searches of all of Burton's clothing (requiring him to strip nude) (id. 42–43) and by visual body cavity searches. In sharp contrast, shakedowns as to the rest of the prison population occur on about a once-a-month basis, though "it could be more than that" (P. 12(n)(2) ¶ 65; Morgan Dep. 7).

On December 27 Kuchel, Morgan and Simpson conducted still another shakedown of Burton's cell (Burton Dep. 49–50), this time finding a number of pink capsules.

**2.** Defendants (including Kuchel) do not deny the text's version of the story in any of their submissions on the current motion. If Kuchel's deposition does actually controvert Burton's account in any way, the relevant portions have not been proffered to this Court.

**3.** For his part, Morgan has no recollection at all of what follows in the text, though he did testify, "I suppose it's possible" (Morgan Dep. 5).

**4.** Stateville inmates with complaints about the conduct or actions of prison employees may file a Committed Person's Grievance Report ("Grievance"), which is then investigated by a Grievance Officer. After that officer sends a report of his or her findings and recommendations to Warden Godinez for review, Godinez either endorses or vetoes the recommendations, a determination that is in turn appealable to the Administrative Review Board and ultimately to Department's Director (P. 12(n)(2) ¶¶ 34–40; Final Pretrial Order ("FPTO") Uncontested Facts ¶¶ 10–17). On a more informal level, disgruntled prisoners also have the option to take their problems directly to a Captain or Lieutenant or else to submit a written request to be placed on the "call line" to speak directly to the Warden or his assistant (P. 12(n)(2) ¶¶ 41–43, FPTO 18–20).

**5.** On November 30 Burton submitted a second written appeal to meet with the Warden about the shower incident (P.Ex. 9). That request was honored on December 18 when Assistant Warden Springborn, working the call line, met with Burton. No further action was taken, however, because Springborn left the interview with the impression that Burton was satisfied that the issue had been resolved (Springborn Dep. 12–14, 37–38).

**6.** Again defense counsel have not brought to this Court's attention any Kuchel deposition testimony at odds with what is said here.

**7.** In addition, the officers refused to provide Burton with any "shakedown slip" as required by Stateville rules (P. 12(n)(2) ¶¶ 62–63).

Though Burton says he informed them that the capsules were actually sleeping pills prescribed by Stateville medical personnel and lawfully in his possession (P. 12(n)(2) ¶ 105; Burton Dep. 60–64), Simpson and Currie insist that the capsules tested positive for cocaine (see P.Ex. 31, Simpson's Disciplinary Report describing the confiscation and testing of the capsule; Currie Dep. 38–46, stating that he personally witnessed the same). However, on the basis not only of Burton's testimony but also from other record evidence,[8] this Court credits Burton's version on the present motion. Later that day COs Kuchel, Simpson and Malone, along with Lieutenants Buchanan and Currie, returned to Burton's cell to conduct an additional shakedown (P. 12(n)(2) ¶ 77),[9] informing him that they had discovered illicit drugs during the first one (Burton Dep. 48). What follows is Burton's account of that second December 27 shakedown.

Burton was once again ordered to strip, was handcuffed and then watched as the officers began "tearing things up" (Burton Dep. 48–49). Buchanan and Kuchel began to help themselves to clothes and other possessions that Burton had purchased at the prison commissary (P. 12(n)(2) ¶ 80; Burton Dep. 49). That included Burton's radio, which Kuchel later smashed to pieces against the floor in front of Burton (P. 12(n)(2) ¶ 79; Burton Dep. 55–56). Kuchel also opened and read confidential correspondence between Burton and his public defender pertaining to the pending appeal of his criminal convictions (P. 12(n)(2) ¶ 78; Burton Dep. 56–58). Finally, while Buchanan was removing Burton's handcuffs (P. 12(n)(2) ¶¶ 81–82; Burton Dep. 49, 51, 65–67):

> Kuchel stepped up on the side of him and said as he was walking—like, approaching me, you better drop the grievance or I'll pay somebody a carton of squares [cigarettes] to kick your ass, and hit me in the stomach.

Following the blow Kuchel and Burton began to wrestle, after which Buchanan took Burton off to segregation, where he remained confined for slightly more than six months.

Later Incident Reports submitted by the officers recounted a different version. Kuchel wrote up a disciplinary ticket the next day charging Burton with having started the violence by taking a swing at Kuchel, hence creating the need to subdue Burton (P.Ex. 11). Morgan's Report (P.Ex. 13) corroborates that, but Buchanan's acknowledges only that "Kuchel stated" that Burton attempted to hit him (P.Ex. 12). Because it was disputed, Burton's Disciplinary Ticket was referred for resolution to an investigator for the Adjustment Committee who, after taking statements from Simpson, Buchanan and Kuchel (but apparently not from Burton or his cellmate), sided with the COs and recommended various punitive measures. One of the Warden's assistants adopted and signed that recommendation, which in part included a term of six months in segregation and three months' commissary and audiovisual denial (P. 12(n)(2) ¶¶ 90–92; Ex. 18).

Not content with the matter, Burton wrote a second grievance after the December 27 shakedown and followed that up over the next three months with six letters to various prison officials (P. 12(n)(2) ¶¶ 93–94). On February 17, 1993 a Grievance Officer denied Burton's second grievance (id. ¶ 95). Though Godinez concurred with that determination, he made a notation on the Report regarding Burton's allegations that prompted

---

**8.** See P.Ex. 13, Morgan's Report stating that the officers were there on a "routine shakedown." Indeed, P. 12(n)(2) ¶ 101 points out that neither the Incident Reports filled out by Buchanan and Morgan (P. Exs. 12 and 13) nor Kuchel's December 27 Disciplinary Ticket (P.Ex. 11) nor the subsequent statements of Simpson, Kuchel or Buchanan to the investigator for the prison disciplinary Adjustment Committee ("Adjustment Committee") (P. Exs. 14–17) mention cocaine or pink capsules. Moreover, the shakedown record lists no such items (P.Ex. 10), and FPTC ¶ 27 acknowledges:

> No inventory of the alleged capsule or capsules containing cocaine was ever made. To date the capsule allegedly found by the officers on the first search has never been located.

Based in part on those facts, on March 17, 1993 the Adjustment Committee found Burton not guilty of any drug offense (P.Ex. 32).

**9.** Burton has been unable during the course of discovery to identify any person responsible for ordering the December 27 shakedown (FPTO Ex. H ¶ 14).

Springborn to ask the Internal Affairs Department to inquire a little deeper (Springborn Dep. 20–21). That, however, did not take place until July 1993 (some four months after this lawsuit was filed). Chief investigator Tom Schonaur conducted the investigation and concluded on August 18, 1993 that Burton's claims were without merit (P. 12(n)(2) ¶¶ 97–100). Despite the pendency of this action, the Internal Affairs Department destroyed the notes and drafts from the investigation (*id.* ¶ 100).

*Burton's Substantive Claims*

Because Warden Godinez stands in a different posture from that of the other four remaining defendants for Section 1983 purposes, this opinion will discuss his situation separately before addressing Burton's four claims on a subject matter basis (though in a different sequence from their listed order in the AC). That latter task is rendered more complicated by the AC's somewhat disjointed presentation, which makes it difficult to get a handle on precisely what is being alleged against whom. Although the AC is drafted in such a way as to imply that all of the defendants are responsible and hence liable for each wrongdoing, it will become plain that some arguments have no application at all to various of the defendants.

Another misleading aspect of the AC also bears preliminary mention. It adverts in a number of places to obviously inapplicable constitutional provisions. Because that kind of error (or, for that matter, the total omission of any citation to a theory of recovery) makes no difference to the viability of a claim (see, e.g., *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1134 (7th Cir.1992)), this opinion will ignore such mistakes and will speak instead in terms of the correct provisions.[10]

*Godinez' Nonliability*

■ Prison wardens (like other state actors) cannot be liable under Section 1983 on the basis of any respondeat superior theory (*Del Raine v. Williford,* 32 F.3d 1024, 1047 (7th Cir.1994), citing *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and numerous Seventh Circuit cases). But such supervisory personnel can nonetheless still be culpable for conduct of their subordinates if "personally involved in that conduct" (*Del Raine, id.* at 1052 (Manion, J., concurring), citing *Jones v. City of Chicago,* 856 F.2d 985, 982 (7th Cir. 1988)). Personal involvement can take the form of formulating and directing an unconstitutional policy or of facilitating, condoning or consciously ignoring known unconstitutional conduct (*id.*). As *Black v. Lane,* 22 F.3d 1395, 1401 (7th Cir.1994) has said in addressing the liability of a prison warden:

> As this court has held, an official meets the "personal involvement" requirement when "'she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.'" *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985) (citation omitted). In *Rowe,* we held the Director of the Department of Corrections liable because the director "knew of the actions of his subordinates which resulted in a constitutional violation" and "failed to take any preventive action." *Id.*

Accord, *Jones,* 856 F.2d at 992–93.

■ Godinez' professed liability is predicated on Burton's arguments that Godinez approved both the dismissal of Burton's grievance and the disciplinary recommendations against him, and further that Godinez "did not take any action to keep Kuchel away from Burton, or otherwise prevent the harassment of Burton" (P. Mem. 16–17, citing *Black,* 22 F.3d at 1401).[11] Those at-

---

10. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

11. That last assertion is at odds with Burton's throw-in accusation that "Godinez was responsible for transferring Burton to Menard over Burton's objections" (*id.* 17). Quite apart from the absence of any record reference by Burton supporting that assertion (see P. 12(n)(2) ¶ 92), such a transfer could not be actionable under Section 1983 in any event (see, e.g., *Williams v. Faulkner,* 837 F.2d 304, 309 (7th Cir.1988), *aff'd sub nom.*

tempts to establish personal involvement on Godinez' part fail to satisfy the standard set forth in *Del Raine, Black* and *Jones,* because Burton has made no showing that creates an inference of Godinez' deliberate indifference.

Godinez' Aff. ¶ 3 says that he knows nothing of Burton or his various complaints. As a matter of routine Godinez designates members of his staff to investigate disciplinary matters, so that he did not personally review or sign any Adjustment Committee Summary Reports or the attendant Incident Reports stemming from the December 27 shakedown (*id.* ¶ 4). Burton's efforts to controvert Godinez' Affidavit are thoroughly misguided.[12]

Godinez' expression of absolute ignorance must not be taken literally, however, for he acknowledges that he read Burton's letters received by his office on December 1, 1992 and January 4, 1993. One of those letters (P.Ex. 21) lays out Burton's complaints in significant detail, and it bears a notation consistent with Godinez' Aff. ¶ 6 statement that he reviewed it and then assigned the matter to his executive staff for resolution. But there is no need to decide (with reasonable inferences drawn in Burton's favor) as to the level of Godinez' knowledge or lack of it, for his actions or lack of action did not exhibit the necessary quantum of deliberate or reckless indifference anyway.

No warden in charge of a 2000–plus inmate maximum security institution such as Stateville can possibly handle every inmate grievance personally. Godinez' testimony that he routinely delegates to his subordinates the responsibility for addressing prisoner complaints is uncontroverted, and all the evidence indicates that practice resulted in actual consideration of their claims (see, e.g., Springborn Dep. 9–10, reflecting the Assistant Warden's interview of Burton as to his November complaint). Such a system cannot be characterized as evincing deliberate indifference on Godinez' part (*Davidson v. Can-*

*non,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 669–71, 88 L.Ed.2d 677 (1985)). Summary judgment in Godinez' favor is therefore mandated on all counts, and he is dismissed as a defendant.

### Excessive Force (Count II)

■ Count II alleges two instances of Kuchel's use of excessive force: when he shoved Burton against the wall during the November shower skirmish and again when he punched Burton during the December shakedown (AC ¶¶ 39, 41). Burton's testimony mirrors those allegations. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989) (citation omitted) explains the analytical approach to such claims:

> In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.... The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard.

In this instance the relevant constitutional standard is the Eighth Amendment's prohibition against cruel and unusual punishment (*Kinney v. Indiana Youth Cntr.,* 950 F.2d 462, 465 (7th Cir.1991). In that respect Burton's claim is governed by *Hudson v. McMillian,* 503 U.S. 1, ——, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992):

> [W]e hold that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986) ]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

---

*Neitzke v. Williams,* 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338).

**12.** P. Mem. 17 asserts:
> Godinez should be presumed to have knowledge of Burton's initial grievances, especially since Assistant Warden Springborn discussed with plaintiff the problems he was having with

Kuchel just eighteen days before the December 27 shakedown.

But that deals only with the knowledge of Springborn, not of Godinez. Any inference in the latter respect in the absence of any evidence would necessarily be based on respondeat superior, a position foreclosed by the case law.

Burton has surely created a reasonable inference that Kuchel acted with the requisite malice on both occasions (*Hill v. Shelander*, 992 F.2d 714, 717 (7th Cir.1993)). Kuchel's shove during the shower encounter was unprovoked and was in no way related to any "effort to maintain or restore discipline," while Kuchel's contemporaneous use of the term "nigger" manifested the level of maliciousness necessary to satisfy the test (cf. *Thomas v. Stalter*, 20 F.3d 298, 302 (7th Cir.1994)). As for the later punch to Burton's stomach, although Kuchel (and several other Stateville employees) maintain that Kuchel was acting defensively to subdue Burton's belligerent outburst (Simpson Dep. 30–33; Morgan Dep. 19–20), Burton's contrary version (his Dep. 49, 51, 65–67) of Kuchel's brutality coupled with his "kick your ass" admonition (together with the pattern of retaliation evidence discussed below) suffices to create a factual question. *Thomas*, 20 F.3d at 302 recently reached a similar conclusion in reversing a judgment notwithstanding the verdict:

> Viewing the evidence in the light most favorable to Mr. Thomas, Officer Heath hit Mr. Thomas in the mouth with a clenched fist while Mr. Thomas was held immobilized by at least nine other people. A punch in the face to subdue Mr. Thomas was not necessary to carry out the court order. The apparent lack of reason for the blow, the fact that Heath used a clenched fist, the fact that Heath then said "shut up" can be interpreted reasonably as establishing that Heath's action was not a "good-faith effort to maintain or restore discipline," but rather was done "maliciously and sadistically to cause harm."

See also *Hill*, 992 F.2d at 717–18.

To survive summary judgment, Burton's claim must surmount one additional obstacle: Some sort of injury must have resulted from the excessive use of force. Though *Hudson*, 503 U.S. at ———————, 112 S.Ct. at 999–1000 recently clarified that no "serious inju-ry" is required, Burton must still show something more than the mere de minimis use of physical force (*id.* at ——, 112 S.Ct. at 1000).

On that score, *Hudson's* teaching (*id.*, stating "That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action") knocks out Burton's claim based on the shower push (Burton Dep. 27–28 confirmed not only that he did not seek medical treatment, not itself a controlling fact, but also that he suffered no bleeding cuts, no abrasions and no physical difficulties at all). But Kuchel's gratuitous punch in the stomach is of sufficient gravity to warrant putting the issue before a jury, even though Burton does not aver any significant bruises or swelling.[13] As *Hudson*, —— U.S. at ——, 112 S.Ct. at 1000 (citation omitted) went on to say:

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

*Hudson*, *id.* at ——, 112 S.Ct. at 999 (quoting *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085) had earlier explained that the presence or absence of a serious injury is a relevant but not necessarily dispositive component of the more important inquiry: "whether the use of force could plausibly have been thought necessary" or whether it "instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."

Consistently with that line of analysis, evidence establishing conduct in accord with a retaliatory motive would likewise go ·directly

---

**13.** *Hudson, id.* 503 U.S. at ——————, at 1001–02 declined to answer the question whether a spontaneous and isolated assault stemming from "a personal dispute between correctional security officers and a prisoner" in violation of prison policy can constitute punishment within the meaning of the Eighth Amendment. Because Kuchel's punch is but one component of a larger pattern of mistreatment (for which purpose the earlier shove, though not separately actionable, may be taken into account), this opinion need not take a position on the matter either.

to the prison official's "knowing willingness." Thus because Burton's evidence (discussed more fully below) lends itself at the very least to a fair inference of retaliation on Kuchel's part, a lesser showing of injury is needed to establish the requisite wantonness. And Burton's testimony satisfies the *Hudson* standard (see *Thomas*, ·20 F.3d at 302 (one punch to the face); P. 12(n)(1) ¶ 25 ("Burton necessarily suffered some physical injury as a result of being punched"). Summary judgment on Burton's excessive force claim is therefore denied as to Kuchel.

■ As for the other defendants, the Count II prayer for relief against "defendants" collectively clearly amounts to overreaching. No one other than Kuchel is accused of a single violent act against Burton— not even of restraining him while Kuchel acted. Nor is there any ground for recovery against other defendants on a *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972) failure-to-intervene theory (an argument not advanced by Burton). *Gibbs v. Franklin*, 18 F.3d 521, 525 (7th Cir.1994) teaches that "deliberate indifference" in that context must involve prior actual knowledge of an impending but readily preventable attack, and Burton does not suggest how any of the guards present could have either known or prevented Kuchel's sudden outburst. Hence every defendant other than Kuchel is entitled to be dismissed from Count II.

*Reading Burton's Legal Mail (Count IV)*

■ AC ¶¶ 39–40 allege that during the second December 27 shakedown Kuchel took from a box labeled "Legal Papers" confidential correspondence between Burton and his public defender about his criminal appeal. Kuchel allegedly then read the documents (each of which was purportedly marked clearly as legal and confidential) as Burton looked on, taunting him about their contents. As is the case with all of Burton's arguments, he insists that conduct is exacerbated by retaliatory intentions (P. Mem. 7–15), and he frames it against all defendants (AC ¶ 41).

But by definition allegations do not suffice for summary judgment purposes—evidence is what controls (Rule 56(e)). Burton's evidence on this subject (all necessarily testimonial) is brief (Burton Dep. 56–59), but his account is undisputed. It supports the AC's accusations in substantive terms, although not in every particular. Furthermore, Burton's testimony (Dep. 79) also says that Buchanan read his legal mail as well (though that was not specifically alleged in the AC, AC ¶ 41 spoke generically of "defendants").

With enough evidence having been proffered to allow a jury to find the nonconsensual reading of Burton's legal mail in his presence, each side has addressed the question of actionability of that conduct in a less than satisfactory way. D.Mem. 8 cites only a case dealing with the damages that must be shown to sustain a quite different claim of assertedly depriving an inmate of access to a prison law library, while Burton's counsel has countered with three cases from other Courts of Appeals that do not zero in precisely on the issue at hand (all three deal with the different proposition that any *permitted* opening of legal mail must take place in the inmate's presence).

That deficiency in research is hard to understand, because this Court's own recollection of a recent per curiam Seventh Circuit decision (*Castillo v. Cook County Mail Room Dept.*, 990 F.2d 304, 306–07 (7th Cir.1993)) led swiftly to the location of substantial other authority supporting Burton's claim. *Castillo* had been foreshadowed by *Wolff v. McDonnell*, 418 U.S. 539, 574–77, 94 S.Ct. 2963, 2983–85, 41 L.Ed.2d 935 (1974), especially the statement in *id.* at 575, 94 S.Ct. at 2984 (emphasis in original) that the prison authorities "now concede that they cannot open and *read* mail from attorneys and inmates." [14] Several other circuits (though not all, *Walker v. Navarro County Jail*, 4 F.3d 410, 413 (5th Cir.1993)) have expressly found conduct such as Kuchel's and Buchanan's to be violative of inmates' constitutional rights (see, e.g., *Lavado v. Keohane*, 992 F.2d 601,

---

14. *Gaines v. Lane*, 790 F.2d 1299 (7th Cir.1986) quoted another relevant passage from *Wolff*, 418 U.S. at 577, 94 S.Ct. at 2985 in contrasting the permissible *opening* of such privileged mail in an inmate's presence and the "[q]uite obviously ... different situation [that] would be present if the prison officials actually read the privileged mail" (790 F.2d at 1306).

609–10 (6th Cir.1993); *Reneer v. Sewell*, 975 F.2d 258 (6th Cir.1992) and *Lemon v. Dugger*, 931 F.2d 1465, 1466–68 (11th Cir.1991);[15] accord, *Khamfeuang Thongvanh v. Thalacker*, 17 F.3d 256, 258–59 (8th Cir.1994) (stating the same conclusion)).

Thus summary judgment on Count IV must be and is denied as to Kuchel and Buchanan. It is granted as to the other defendants.

*Strip Searches and Privacy (Count III)*

AC ¶¶ 39–41 allege that from the week following November 29 through and including December 27 Kuchel, Morgan, and Simpson subjected Burton to degrading strip searches "almost daily," including invasive "visual body cavity searches." That is fully borne out by Burton's testimony, in which he described how he was ordered to take off all of his clothing, after which (his Dep. 42–43):

they would tell me to turn around, squat, grab my cheeks, and run my hands through my hair.

As with Burton's other claims, the prison officials offer no exculpatory explanations because they deny his version in its entirety (e.g., Morgan Dep. 30 (Burton "definitely was not" stripped during the December 27 search)).[16] But Burton Dep. 37–43, 93 tells a story of frequent occurrences, and this Court necessarily credits his version—by definition it must not resolve that factual dispute on the current Rule 56 motion. Instead this opinion turns to a review of the relevant law.

Here the constitutional claim is grounded in the right to privacy, which "is now firmly ensconced among the individual liberties protected by our Constitution" (*Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir.1994), citing *Planned Parenthood v. Casey*, —— U.S. ——, ——–——, 112 S.Ct. 2791, 2804–08, 120 L.Ed.2d 674 (1992). In that regard the case law makes clear that freedom from strip searches and degrading body inspections may be one manifestation of that right, although "[s]ome diminution of privacy is of course to be expected in prison" (*Canedy*, 16 F.3d at 185, citing *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). As *Rowe v. DeBruyn*, 17 F.3d 1047, 1049–50 (7th Cir.1994) (quotation marks and citations omitted) has summarized:

There is no iron curtain drawn between the Constitution and the prisons of this country. Imprisonment, however, necessarily entails that an inmate lose many of the rights ordinary citizens enjoy. Furthermore, prisons must be able to curtail a prisoner's constitutional rights not only to further correctional goals, such as retribution or deterrence, but also to serve institutional objectives, the most basic of which is the internal security of the prisons themselves.

We base our review of prison discretion upon the recognition that a prisoner's liberty interests are significantly restricted by the fact of his incarceration, and that prison officials must have broad discretion to dictate policies that promote order and safety for inmates and correctional staff.

See also *Del Raine*, 32 F.3d at 1042, expressing reluctance to engage in "federal court micro-management of a penological facility" or to "intervene in decisions within the purview of the warden and the Bureau of Prisons."

■ To the extent that Burton asserts that strip or visual body cavity searches are per se constitutionally objectionable, he fails as a matter of law. *Bell v. Wolfish*, 441 U.S. 520, 558–62, 99 S.Ct. 1861, 1884–86, 60 L.Ed.2d 447 (1978) specifically upheld the use of such penological devices against Fourth Amendment and Due Process Clause challenges,[17] so long as such searches are

---

**15.** Because this Court is well aware that district court decisions do not make precedent, this opinion has eschewed citing a number of such decisions that this Court's law clerk located—all holding the same way.

**16.** Simpson insists (his Dep. 5–6, 50–51) that his presence at the second December 27 shakedown marked the first and only time he was ever involved with shaking down Burton's cell. In

fact he goes on to state (*id.* at 53) that before that date he had no knowledge of Burton at all. Morgan Dep. 6, 10 tells a similar story ("I'm positive that [the late December shakedown] was the only time I was in his cell for a shakedown"). Kuchel proffers no similar denials at all.

**17.** In that case plaintiffs were federal pretrial detainees, as to whom the Fifth Amendment's Due Process Clause (which was held to provide

"conducted in a reasonable manner" (see also *Bruscino v. Carlson*, 854 F.2d 162, 166 (7th Cir.1988) and *Campbell v. Miller*, 787 F.2d 217, 228 (7th Cir.1986)).[18] *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884–85 (citations omitted) explained further:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases.

■ Beyond any claim of per se unconstitutionality, Burton takes issue with the specific searches in this case on the grounds that they were unreasonable and were undertaken with the deliberate intent to torment him. He claims not only a lack of justification for conducting the searches but also (though his Dep. 43 acknowledges that no officer ever touched him in the course of a cavity search) their scope and the manner in which they were conducted.[19] In that respect this Court must look for the presence of "calculated

harassment unrelated to prison needs" (*Del Raine*, 32 F.3d at 1040, quoting *Hudson*, 468 U.S. at 530, 104 S.Ct. at 3202; *Meriwether*, 821 F.2d at 418).

Burton's testimony does suffice to justify an inference of calculated harassment. Because the prison officials deny that the searches took place at all, they make no arguments as to probable cause or as to the relative frequency of Burton's searches compared to those of other prisoners. Nor could they quarrel on the frequency issue, for Morgan's testimony confirms that the normal incidence of shakedown searches at Stateville was only approximately monthly. Defendants are also completely silent about Burton's allegations that he was instructed to bend over and expose himself. And because the frequency of repetition (wholly unjustified by any positive results from prior searches) strongly supports the notion that the searches were in no way connected to any legitimate prison administration objectives, such forced chronic strip and body cavity searches are fairly construed as unacceptable torment, especially when coupled with the guards' admissions that searches of that nature are proscribed by prison policy (Simpson Dep. 29; Morgan Dep. 40–41).[20] As *Hudson v. Palmer*, 468 U.S. 517, 528, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984) teaches:

> Of course, there is a risk of maliciously motivated searches, and of course, intentional harassment of even the most hard-

them with protection against "punishment") was the equivalent of the Eighth Amendment's prohibition of "cruel and unusual punishment" applicable to convicted inmates.

18. *Del Raine*, 32 F.3d at 1038–42 took that principle a step further and condoned the use of digital rectal probe searches by a physician's assistant (as contrasted with the visual ones ascribed to correctional officers here), even though such searches may be "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive" (*id.* at 1041–42). Nonetheless *Del Raine, id.* at 1040, dealing with an Eighth Amendment argument, reconfirmed the earlier decision in *Meriwether v. Faulkner*, 821 F.2d 408, 418 (7th Cir.1987) that a strip search conducted before guards for purpose of "calculated harassment unrelated to prison needs" was actionable. In addition *Del Raine*

noted at 1040 n. 6 that such a search "may also be cognizable under the Fourth Amendment as it specifically relates to privacy."

19. Burton did not make an issue of the fact that he allegedly was forced to wait naked in the jail corridor or "day room" for the duration of the shakedowns (Burton Dep. 48), but at least to a limited extent the consideration of where a search takes place is also relevant to its reasonableness (*Del Raine*, 32 F.3d at 1040).

20. D.R. Mem. 2 n. 1 quotes Department Rule § 501.220(b) for the circumstances under which body searches are permissible. For present purposes, it is unnecessary to decide whether that Rule differs from the guards' testimony, because deliberate harassment cannot be tolerated in any event.

ened criminals cannot be tolerated by a civilized society.

Thus Burton's account of almost daily strip and body cavity searches averts summary judgment.

One related question remains: Against which defendants does that claim survive? AC ¶¶ 39–40 ascribe the challenged conduct to Kuchel, Morgan and Simpson, and Burton Dep. 37 and 40 support that.[21] But Morgan has been voluntarily dismissed, and none of the other officials has been charged with strip searching Burton. To the extent that other defendants were present during the second December 27 shakedown, their participation in that single incident cannot give rise to any suggestion of a harassment pattern. That brings the other defendants' actions within *Bell*'s approval of reasonable strip and body cavity searches. Summary judgment is therefore mandated as to all defendants except Kuchel and Simpson.

*Retaliation (Count I)*

Burton also charges Stateville employees with abusing him on the basis of his race and in retaliation for exercising his First Amendment rights. As AC ¶¶ 35–36 tells it:

35. The actions of each Defendant were motivated by animosity toward Plaintiff because of his race and/or by a desire for retaliation against Plaintiff for Plaintiff's filing of a grievance against Kuchel and complaining to prison officials about Kuchel's wrongful conduct. Each Defendant deliberately persecuted Plaintiff because Plaintiff is a black person who stood up for his constitutional rights and for the enforcement of prison rules by exercising his right to speak, as protected by the First Amendment....

36. The actions of all Defendants collectively constituted a conspiracy among the Defendants to deprive Plaintiff of his constitutional rights. [Burton then repeats both of the claimed motivations set out in ¶ 35: racial animus and retaliation for whistleblowing]. The purpose of the conspiracy was to make prison administration "easier" from the perspective of De-

fendants by deliberately persecuting Plaintiff for being a black person who stood up for his constitutional rights and for the enforcement of prison rules.

At the pleading stage such allegations (in conjunction with the rest of his story) would have survived a Rule 12(b)(6) attack, because they set out "a chronology of events from which retaliation may be inferred" (*Black,* 22 F.3d at 1399). Now, however, Burton must have submitted *evidence* that his grievances were "a substantial or motivating factor in the prison officials'" complained-of conduct (*Brookins v. Kolb,* 990 F.2d 308, 315 (7th Cir.1993); cf. *Cromley v. Board of Ed. of Lockport Township H.S. Dist. 205,* 17 F.3d 1059, 1067–68 (7th Cir.1994) (considering charges of retaliation against the exercise of First Amendment rights in the employment context)). In that regard "it is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper" (*Howlan v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987), quoting *Buise v. Hudkins,* 584 F.2d 223, 229 (7th Cir.1978); *Matzker v. Herr,* 748 F.2d 1142, 1150–51 (7th Cir.1984)).

■ As with Burton's other claims, review is called for on a defendant-by-defendant basis. And that process results in the dismissal of part (but by no means all) of the retaliation claim.

First of all, for Currie and Malone there is no need to reach the question of retaliatory motive, because there is no evidence that they injured Burton in any cognizable fashion. They are not asserted to have participated in any shakedowns other than the second one on December 27 (Currie Dep. 12), and nothing that they did during the course of that incident can fairly be characterized as detrimental to Burton. Currie, who was involved only because he was called in as backup to assist a shakedown in progress (*id.* 13), stood outside the cell without taking any part (*id.* 33–34; Morgan Dep. 13; see also Burton

---

**21.** When asked whether he recalled "Kuchel, Morgan, and *Sims*" shaking him down on November 29, Burton answered in the affirmative

(Dep. 37). But that reference to Sims appears to be either counsel's error or one of transcription.

Dep. 78). Uncontradicted testimony by Morgan (Dep. 13) [22] says that Malone also generally remained outside the cell throughout the incident. Burton counters with nothing to dispute that evidence.

As to Kuchel, of course, Burton's pending grievance against him, together with Kuchel's warning to drop it or else face consequences, are surely enough to convert Kuchel's gratuitous physical attacks and his persistent abuse in the form of repeated shakedowns and strip searches and destruction of property [23] into a viable claim for retaliation. Burton's evidence has earned him a chance to submit the question to a factfinder to evaluate the relative credibility of the clashing testimony (as in, e.g., *Harris v. Fleming*, 839 F.2d 1232, 1238 (7th Cir.1988) and *Ustrak v. Fairman*, 781 F.2d 573, 577 (7th Cir.1986)).

Buchanan and Simpson (who, unlike Currie and Malone, are claimed to have injured or harassed Burton in some way) pose a different problem. To be sure, none of their misdeeds are actionable in Count I terms on the theory that they were in retaliation for Burton's filing of grievances against *them*. Burton Dep. 71 admits that Buchanan "didn't do anything in retaliation for grievances against [him] because" there were none pending against any officer except Kuchel. As for Simpson, at one point Burton Dep. 70 said his grievance was filed against not just Kuchel but against Simpson as well, but Burton later changed his story and conceded that it pertained to Kuchel alone (*id.* 88–91 ("Just Kuchel")).[24]

But that does not end the matter. There remains the question whether those officers participated in what must be accepted as harassing shakedowns,[25] in the reading of Burton's legal mail (on Buchanan's part) and in the improper strip searches (on Simpson's part) in retaliation for Burton's grievance targeting *Kuchel*. And an affirmative answer to that question is a reasonable inference from the fact that the pattern of activity in which those officers participated with Kuchel—a pattern totally at odds with the normal incidence of shakedowns as to all other Stateville inmates [26]—began hard on the heels of Burton's institution of the Kuchel grievance (see such cases as *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir.1985), quoted and reaffirmed in *Murphy v. Lane*, 833 F.2d 106, 108–09 (7th Cir.1987), and cases cited in *Benson*). It is true that the two officers disclaim any knowledge of that grievance at that time, but that is totally a matter of credibility (one incapable of objective confirmation of disproof), as to which a jury would be entitled to disbelieve the testimony of the interested parties. Armed with the reasonable inferences to which he is entitled, Burton has thus presented a viable retaliation claim against Buchanan and Simpson as well.

In addition to his grievance-based retaliation theory, Burton also argues that he was the subject of retaliation motivated by racial animus. But that is wholly devoid of any evidentiary support as to any defendant except Kuchel. Three defendants (Malone, Currie and Buchanan) are themselves African-American, and Burton proffers not a scintilla of evidence in support of his belief

**22.** Malone's deposition was apparently not taken.

**23.** In that latter respect, D. Mem. 7–8 and D.R. Mem. 8–10 attempt to erect a straw man and then to knock it down by asserting the existence of a post-deprivation remedy. That misses the whole point of Burton's claim, which does not rest on any Fourteenth Amendment deprivation-of-property notion at all.

**24.** Burton similarly ascribes nothing arguably retaliatory to Currie or Malone either (see his Dep. 71).

**25.** It is true that the destruction of property in the course of searches of Burton's *cell* (as con-

trasted with the violation of privacy involved in searches of his *person*) is nonactionable in Fourth Amendment terms even if retaliatory in nature (*Hanrahan v. Lane*, 747 F.2d 1137, 1139 (7th Cir.1984), relying on *Hudson v. Palmer*, 468 U.S. at 529–30, 104 S.Ct. at 3201–02). But that does not preclude the consideration of such conduct as evidence of a retaliatory motive to support proof of other claims that *are* actionable.

**26.** Relatedly, Burton testified that it was not normal for three correctional officers working one wing at Stateville (Dep. 38)—another indication that could be viewed as confirmatory of his being singled out for harassment beginning with the November 29 shakedown.

that either they or any of the others besides Kuchel took his race into account in any way. Pure conjecture on Burton's part, without any effort toward substantiation, simply will not do.

Hence it is only as to defendants Currie and Malone that Burton has failed to satisfy the *Brookins* "substantial or motivating factor" test. See also this Court's opinion in *Vega v. DeRobertis*, 598 F.Supp. 501, 506 (N.D.Ill.1984).

### Conclusion

There are no genuine issues of material fact as to a number of Burton's claims against most of the six remaining defendants:

1. Defendants Malone and Currie are entitled to a judgment as a matter of law on Burton's Count I (retaliation) claim.

2. All defendants except Kuchel are entitled to a judgment as a matter of law on Burton's Count II (excessive force) claim.

3. All defendants except Kuchel and Simpson are entitled to a judgment as a matter of law on Burton's Count III (privacy) claim.

4. Finally, all defendants except Kuchel and Buchanan are also entitled to a judgment as a matter of law on Burton's Count IV (legal mail) claim.

This action is thus ordered dismissed in its entirety as to defendants Malone, Currie and Godinez.

All of Burton's claims other than those referred to in the four numbered paragraphs remain viable. Counsel for the parties are ordered to appear in open court for a status hearing at 9 a.m. September 23, 1994 to discuss what remains to bring the case to trial on those surviving claims.