**Benny Frank NETTLES**

v.

**Carl R. GRIFFITH, Jr., et al.**

No. 1:94–CV–30.

United States District Court,
E.D. Texas,
Beaumont Division.

April 13, 1995.

138

Karen Lewis, Beaumont, TX, for plaintiff.

Richard Baker, Asst. Dist. Atty., Jefferson County, TX, for defendants.

## OPINION

HINES, United States Magistrate Judge.

Plaintiff Benny Frank Nettles sues Carl R. Griffith, Jr., Sheriff of Jefferson County, Texas, and Jeanne Simon, an official of the Jefferson County Detention Center, in their individual and official capacities, pursuant to Title 42 U.S.C. § 1983. Plaintiff asserts claims for denial of due process of law under the Fourteenth Amendment and for failure to protect under the Eighth Amendment.

The parties consented to trial and entry of judgment by a United States magistrate judge. On October 12, 1994, a bench trial was conducted in Beaumont, Texas. Due to a party's illness, the court ordered a recess and re-convened testimony on November 21, 1994.

Jurisdiction is based on Title 42 U.S.C. § 1983. Because Jefferson County is within the geographic confines of the Eastern District of Texas, Beaumont Division, venue is proper. *See* 28 U.S.C. § 1491.

## I. Facts

On November 28, 1992, plaintiff was a prisoner at the Jefferson County Detention Center in Beaumont. Plaintiff's parole had been revoked. He was awaiting transfer to the Texas Department of Criminal Justice— Institutional Division. He had been incarcerated in Jefferson County for approximately two months but spent the last seven days at the "new Jail." [1]

Following the evening meal, Jesus Tomayo, a correctional officer, turned off the television set in the prisoners' day room. Tomayo stated the inmates had failed to properly clean the room after the meal, and are not permitted to watch television until clean-up is complete.

Plaintiff approached Tomayo and asked why he had turned off the television. Tomayo perceived Nettles as threatening and belligerent. Nettles testified he was neither, but agreed that Tomayo was incensed.

Plaintiff requested to see an official of higher rank. He returned to his cell to await an appointment with another official. After about thirty minutes, he was brought to see Lt. Jeanne Simon. Plaintiff testified he spoke with Lt. Simon for thirty to forty-five minutes.

During this time, Lt. Simon testified they discussed the incident. Lieutenant Simon testified plaintiff told her "he would not remain at the jail." She "took this to mean he was an escape risk." Because the facility still was under construction, Lt. Simon thought the ability to thwart an escape plan might be diminished.

Lieutenant Simon concluded plaintiff should be returned to the old Jail, which had heightened security facilities. She also was of the opinion plaintiff should be placed in administrative segregation ("ad-seg"). [2] However, she did not mention a rule violation and did not tell plaintiff he would be subject to discipline for any infraction. She stated that she did not characterize this consultation as a "hearing."

The new Jail did not have any ad-seg facilities at this time. Lieutenant Simon testified that she did not refer plaintiff to ad-seg, nor did she tell the old Jail officials to place him in ad-seg. She remarked, however, that she "recommended" that a placement in ad-seg would be appropriate and old Jail officials should "talk" to plaintiff before a placement.

Plaintiff returned to his cell. Fifteen to twenty minutes later, six officers arrived, told plaintiff to gather his belongings, and transported him to the old Jail.

Officials at the old Jail immediately processed plaintiff upon his arrival and assigned him to ad-seg. Lieutenant Daniel Duhon processed plaintiff's return into the old Jail facility. Lieutenant Duhon did not give plaintiff any sort of hearing prior to placing him in ad-seg. Rather, Duhon told plaintiff he was being placed in ad-seg on orders of Lt. Simon.

Disciplinary segregation cells are located in the jail's third floor, B wing, upper level ("3B Upper"). However, upon plaintiff's arrival at the old Jail, 3B Upper was completely occupied. Officials took plaintiff to the lower level ("3B Lower"). This level housed prisoners with psychological deficiencies and therefore had acquired the nickname "the nut run." [3]

Plaintiff testified he and his cellmate were the only disciplinary prisoners on 3B Lower. [4]

---

1. The new jail facility was still under construction at the time of the incident in question, leading to its nomenclature. The "old Jail," which continues to house prisoners, is located in downtown Beaumont, while the new Jail is situated on U.S. Highway 69 South, near the city limit.

2. Administrative segregation is a punitive system of depriving prisoners found responsible for disciplinary infractions. Administrative segregation at the Jefferson County Jail includes confinement to the prisoner's cell, which includes deprivation of religious services, recreational time, commissary and daily showering privileges.

3. The parties agreed 3B Upper is reserved for disciplinary problems, while 3B Lower was reserved for the medically and mentally impaired or those "who could not take care of themselves."

4. That plaintiff was on 3B Lower for disciplinary purposes only, is undisputed. Officer Jeff Safar testified that there was no medical reason to place plaintiff in an area generally designated for

3B Lower inmates taunted plaintiff and his cellmate. These prisoners "roamed" the run, causing plaintiff and his cellmate to avoid the front end of the cell closest to the bars. Feces, urine, water, and lighted matches were hurled into plaintiff's cell.

Plaintiff was unaware of why he was in ad-seg and why he was housed in the "nut run." He submitted several complaint forms, or "cop-outs," requesting assistance from or a consultation with officials. Plaintiff testified he witnessed guards destroying several of the cop-out forms. Lieutenant Mark Frederick corroborated that he occasionally has "problems with cop-outs not getting where they are supposed to be." All prisoners enjoyed unimpeded access to cigarettes and matches. On December 6, 1992, plaintiff testified he completed a cop-out that complained of fires on the run and requested smoking materials be taken from the other 3B Lower inmates.

On December 7, 1992, several inmates ignited newspapers and toilet paper on the run during the day. Other prisoners smothered the flames. Later that night, extreme heat awakened plaintiff. His laundry hung on the bars of the cell for pickup,[5] including a mattress cover, several jumpsuits, towels, uniforms, and blankets, was in flames and emanating thick smoke. Fire consumed the trash strewn in front of the bars.

Plaintiff and his cellmate pressed the call button in their cell, but it was inoperative. They yelled for help. Officer Jeff Safar responded and used a water propelled extinguisher to douse the flames.

The bars of the cell opened and plaintiff exited the cell.[6] He slipped on the water emitted from the fire extinguisher, fell, suffered an incarcerated hernia, and underwent immediate emergency surgery at St. Elizabeth Hospital in Beaumont.

After surgery, plaintiff spent four days in the jail infirmary. He then returned to 3B Lower. He remained in ad-seg at this location until December 16, 1992, a total of fourteen days.

In addition to the hernia, plaintiff claims to have sustained injury to his right elbow and forearm in the fall. These injuries continue to give plaintiff arthritic-like pains. He exhibited a burn on his forearm that healed with permanent discoloration, which he treated himself. He further testified he suffers from insomnia and nightmares due to the incident.

Plaintiff seeks $50,000 in compensatory damages and $200,000 in punitive damages.

## II. The Due Process Claim

Plaintiff asserts that the summary process through which he was placed in disciplinary administrative segregation violated his right to due process of law under the Fourteenth Amendment.

### a. The "Protected Liberty Interest" Standard

 The Due Process Clause guards against arbitrary deprivation of protected liberty interests. *See* U.S. CONST. amend. XIV ("No State shall … deprive any person of life, liberty, or property, without due process of law. . . ."). The Due Process Clause alone does not create liberty interests in and of itself. *Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct. 864, 874, 74 L.Ed.2d 675 (1983). If a protected interest has not been created in some other manner, the Due Process Clause is not implicated. *Parker v. Cook,* 642 F.2d 865, 867 (5th Cir.1981). A protected liberty interest arises when state or local rules and regulations sufficiently circumscribe a government official's discretion as to make a course of action mandatory or expected. *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873–74; *Green v. McKaskle,* 788 F.2d 1116, 1125 (5th Cir.1986).

mentally disabled prisoners. Officer Safer also stated that 3B Lower on occasion was utilized as an "overflow" area for ad-seg inmates.

**5.** Defendants stipulated that it is an accepted jail practice to hang inmate laundry on the cell bars for pick-up by laundry personnel.

**6.** Defendants stipulated that plaintiff was not negligent in his hastiness to exit the cell.

■ Plaintiff argues he had a protected liberty interest in remaining in the general jail population and as a consequence, the Constitution guaranteed him at least an informal hearing and notification of the charges against him before placement in ad-seg.[7] He alleges he did not receive this process.[8]

### b. Protected Liberty Interests and Prison Discipline

■ Prisoners charged with rule violations are entitled to certain due process rights under the Fourteenth Amendment when the disciplinary action may result in a sanction that will impose upon a liberty interest. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). A prisoner facing a sanction such as solitary confinement is entitled to advance written notice of the claimed violation, a written statement of the fact-finders, and an opportunity to call witnesses and present documentary evidence in defense. *See Smith v. Rabalais,* 659 F.2d 539, 542 (5th Cir.1981), *cert. denied,* 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982).

The standard is different for imposition of administrative segregation, because, generally, segregation is less restrictive than solitary and has no adverse effect on accumulated good-time credits or impending parole. *See Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873–74.

> An inmate must receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decision maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.* at 476–77, 103 S.Ct. at 874.

### c. Application

#### 1. Did Nettles have a Protected Liberty Interest?

■ The majority of jail officials who testified were in agreement that Jefferson County Detention Center inmates may be placed in segregation for punitive reasons only under very specific circumstances which include advance written notice, formally noticed hearing, post-hearing findings, and periodic review by a disinterested officer. Lieutenant Daniel Duhon testified that absent an emergency, a prisoner cannot be placed in ad-seg without notice, an opportunity to present witnesses, and a written order of findings informing the prisoner he would be placed in ad-seg. Officer Tomayo testified that a hearing is always conducted by a lieutenant prior to an ad-seg referral, and three officers would act as a "jury". Officer Tomayo was unaware of ad-seg ever being imposed without such a hearing. Finally, Lt. Simon concurred that a hearing precedes ad-seg disciplinary action.[9]

7. Plaintiff's transfer from the new Jail to the old Jail is not the issue in this case. He had no constitutional right to remain at the new Jail. *See, e.g., Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

8. The altercation between Tomayo and Nettles is immaterial. It matters not to this court's analysis that plaintiff may or may not have received a copy of the new jail's rules, whether Tomayo and Lt. Simon had reason to believe he was a security risk, or whether plaintiff "deserved" to be placed in ad-seg. The only question before the court on plaintiff's due process claim is whether plaintiff was placed in ad-seg without the due process to which he was entitled.

9. Only Lt. Mark Frederick testified that no hearing of any kind is required for ad-seg assignments. He claimed ad-seg placement is an "administrative decision within the judgment of the officer, without involvement of the prisoner." He testified also that no written notice or finding was required for an ad-seg assignment, and although officers complete violation reports, prisoners do not see them. He stated this applies whether the placement is for a few days or for several months.

But for this last statement, the court might reconcile Lt. Frederick's testimony with that of Duhon, as an "emergency" referral to ad-seg was mentioned by Duhon. However, in that event, Lt. Duhon stated that there would be a review within 72 hours, after which the prisoner would be entitled to normal due process.

Accepting this consensus, the court finds that jail rules, regulations, and practices sufficiently circumscribe corrections officers' discretion as to make the above-described course of action mandatory or expected. Consequently, the court concludes a protected liberty interest existed with respect to removal of inmates from general population to administrative segregation.

## 2. Did Nettles Receive Due Process?

■ The next issue is whether plaintiff's consultation with Lt. Simon constituted a hearing comporting with Due Process requirements. For several reasons, it did not.

First, defendant Simon did not consider her discussion with Nettles to be a disciplinary hearing. Indeed, Lt. Simon insisted at trial she was not the person charged with determining whether plaintiff should be placed in administrative segregation. Second, Lts. Duhon and Frederick testified they did not arrange a hearing for plaintiff. Lieutenant Duhon was laboring under the assumption that plaintiff received a hearing, and other appropriate procedures, at the new Jail.

Lastly, plaintiff never received even informal notification of the charges against him. The charges remained a murky issue even at the time of trial. Two jail officials testified plaintiff's verbal confrontation with Officer Tomayo more likely than not precipitated the referral to segregation, and plaintiff appeared to be under this belief as well. However, jail officials remarked one would not receive two weeks in administrative segregation for "back-talking" to an officer. Lieutenant Simon, who played the pivotal role, testified it was plaintiff's propensity as an "escape risk" that made her "recommend" administrative segregation.

Nettles was never given a hearing, notice of charges pending against him or a statement of reasons. His confinement to administrative segregation was not reviewed—or at least, not reviewed in a manner which would verify that proper initial procedure had been followed. As a result, plaintiff's constitutional right of due process was violated.

## 3. Defendants' Personal Involvement

■ The next issue is whether plaintiff proved that either defendant, Sheriff Griffith or Lt. Simon, deprived him of due process. Personal involvement of a defendant is a necessary prerequisite to liability under section 1983. *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir.1983); *Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir.1982).

■ Sheriff Griffith is sued in his personal and official capacities. The evidence is devoid of any personal involvement by Sheriff Griffith. He cannot become liable personally on the basis of respondeat superior. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir.1990). Therefore, plaintiff's personal capacity suit against Sheriff Griffith fails.

■ Suit against Sheriff Griffith in his official capacity is, in effect, a suit against the county. *See Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Stem v. Ahearn*, 908 F.2d 1, 4 (5th Cir.1990). As a municipality, however, the county is liable only if an unconstitutional policy, custom, or procedure causes injury. *Monell v. Department of Social Servs.*, 436 U.S. 658, 692, 694, 98 S.Ct. 2018, 2036–37, 2037–38, 56 L.Ed.2d 611 (1978). No evidence suggests that plaintiff's treatment was pursuant to official policy, custom or procedure. Indeed, what happened to Nettles appears to violate official jail practices. Therefore, the official capacity suit against Sheriff Griffith also fails.

■ As to Lt. Simon, there is no doubt but that she had personal involvement in events which resulted in Nettles being placed in ad-seg. However, Lt. Simon's testimony raises the issue that she did not intentionally deny Nettles due process. Indeed, at trial she insisted that she did not and could not put Nettles in ad-seg. She asserts she simply "recommended" that Nettles be in ad-seg at the new Jail.

Under Lt. Simon's view, plaintiff simply fell between the cracks of the system. New Jail officials believed plaintiff would receive a hearing at the old Jail while old Jail officials believed plaintiff had received a hearing at the new Jail. While this might demonstrate

negligence,[10] it does not prove an intentional deprivation of due process.

Lieutenant Simon's testimony that she did not order Nettles to ad-seg conflicts with Officer Tomayo's testimony. Moreover, it conflicts with Lt. Simon's earlier testimony submitted via affidavit in support of a motion for summary judgment. There, she stated, "... I reassigned inmate Nettles to the downtown jail and had him placed on Administrative Segregation." Affidavit of Jeanne Simon, Affidavit in Support of Motion for Summary Judgment (filed May 2, 1994). Finally, Lt. Duhon testified that he understood Nettles was being placed in ad-seg on orders of Lt. Simon.

The court concludes that the greater weight of the credible evidence supports a finding that Lt. Simon ordered Nettles to administrative segregation. A deliberate and intentional act precipitated the placement in ad-seg. As a result, Lt. Simon's conduct was not mere negligence, and this action properly comes within the purview of section 1983. *See Franklin v. Aycock,* 795 F.2d 1253 (6th Cir.1986).

### 4. Damages

The issue remains as to recoverable damages. Plaintiff seeks both compensatory and punitive damages, plus attorney fees.

#### a. Compensatory Damages

With regard to compensatory damages, "'the basic purpose' of § 1983 damages is 'to *compensate persons for injuries* that are caused by the deprivation of constitutional rights.'" *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 307 n. 9, 106 S.Ct. 2537, 2542–43 n. 9, 91 L.Ed.2d 249 (1986) (quoting *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978)). "Damages based on abstract 'value' or 'importance' of constitutional rights is not a permissible element of compensatory damages ..." *Id.* 477 U.S. at 310, 106 S.Ct. at 2545. However, "[a] violation of constitutional rights is never de minimis, a phrase meaning so small or trifling that the law takes no

count of it." *Lewis v. Woods,* 848 F.2d 649, 651 (5th Cir.1988). Nominal damages are the appropriate award where constitutional rights have been violated but the plaintiff has not sustained, or proven, actual damages. *Carey,* 435 U.S. at 266–67, 98 S.Ct. at 1053–54.

Quantifying plaintiff's actual damages presents a quandary. First, plaintiff was a convicted prisoner, so he lost no wages when isolated in administrative segregation. This avenue of measure therefore is foreclosed. In addition, no evidence was presented as to other traditional tort elements of damages except possibly for mental anguish, which the court believes to be subsumed in the ensuing discussion of damages for wrongful placement in administrative segregation.

The Fifth Circuit has not considered proper calculation of a prisoner's damages in this situation. Other circuits, however, articulate the concept that a prisoner's damages for wrongful placement in solitary confinement or administrative segregation are measurable. *See, e.g., United States v. Standish,* 3 F.3d 1207 (8th Cir.1993) (remanded for recalculation of damages, stating $500 per day in administrative segregation was excessive); *Smith v. Rowe,* 761 F.2d 360, 368 (7th Cir. 1985) ($119 per day awarded for wrongful segregation); *Saxner v. Benson,* 727 F.2d 669, 672 (7th Cir.1984) ($129 per day awarded for wrongful administrative segregation), *aff'd on other grounds,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985); *King v. Higgins,* 702 F.2d 18, 19–20 (1st Cir.1983), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983) ($25 per day awarded for wrongful solitary confinement); *Maxwell v. Mason,* 668 F.2d 361, 366 (8th Cir.1981) ($100 per day awarded for solitary confinement).

In *Smith v. Rowe,* the Seventh Circuit enumerated factors to consider when assessing damages for wrongful placement in administrative segregation. These included "(1) the nature, extent, and duration of the injury to the plaintiff; (2) general pain and suffering; (3) humiliation; (4) mental dis-

---

**10.** *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (holding negligence insufficient to support claim under 42 U.S.C. § 1983).

tress, and (5) the violation of constitutional rights." In *Saxner v. Benson*, it was noted that the trial court had credited plaintiff's testimony with establishing

> mental and emotional distress injuries attributable to the due process violations. The trial court found that the "anguish and frustration which flowed from the patent unfairness of the hearings and the fear that such unfair treatment would continue in the future in their administrative review and appeals, at their parole hearings, and in their day to day existence in the segregation unit unrelated to the issue of the length (35 days) of time served in segregation" contributed to their actual injuries.

*Saxner*, 727 F.2d at 672.

There is evidence of actual injury in this case. Plaintiff was placed in a section of the jail designated primarily for the mentally imbalanced. He was subjected to conditions in this area which he would not normally have sustained, including the ultimate fire and dousing with hot water and other substances.

Plaintiff testified to the lingering results of his placement in segregation and Williams testified to plaintiff's confusion and fear during the segregation. Plaintiff's situation so moved Williams that he sought assistance for plaintiff from the chaplain. Furthermore, it appears plaintiff may have been panicked at certain times of his segregation, inquiring of Lee three or four times a shift for assistance from supervising officers.

Consequently, the court is presented with a panoply of damages considered reasonable by appellate courts. Inflationary adjustment, *see* UNITED STATES DEPARTMENT OF COMMERCE, 1993 STATISTICAL ABSTRACT OF THE UNITED STATES 481, no. 755 (113th ed.) (purchasing power of the dollar), produces an acceptable range of approximately $30 to $154.

When compared to the facts of existing case law, plaintiff did not endure such egregious circumstances as to warrant an award on the higher end of the scale. For example,

the plaintiff in *Smith*, who was awarded $119 per day (worth approximately $142 per day in 1992) stayed cloistered in segregation for twenty-two and a half months, without heat. *Smith*, 761 F.2d at 364. She was provided nothing except a bed, a dresser, a toilet, and a sink. She waited six weeks for a change of clothing. *Id.*

Testimony was presented showing plaintiff's segregation resulted in diminished privileges, including loss of ability to attend church services and the day room area. Coupled with the mental and emotional toll, a reasonable amount in this case is $50.00 per day in administrative segregation.

■ The causation standard in section 1983 actions generally is proximate cause. *See, e.g., Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 753 (5th Cir.1993); EDWARD J. DEVITT, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 103.03 (3d ed. 1987 & Supp. 1994). Plaintiff may be awarded only such damages as the evidence shows to have been proximately caused by the defendant's wrongful conduct. DEVITT, *supra*, § 103.03. Proximate cause includes components of cause in fact and foreseeability. *See, e.g., Reimer v. Smith*, 663 F.2d 1316, 1322 (5th Cir.1981); *LaPoint v. Shirley*, 409 F.Supp. 118, 120 (W.D.Tex.1976); *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901 (Tex. 1980).

■ The court has concluded earlier that Lt. Simon's conduct was a cause in fact of the unlawful placement of Nettles in ad-seg. The court must next determine whether it was foreseeable to a person of ordinary prudence that Nettles might remain in ad-seg for a total of fourteen days before receiving review by a disinterested officer.

The only evidence submitted to the court on this issue was testimony from Lts. Duhon and Frederick. Duhon stated that ordinary ad-seg review occurs at intervals of fifteen to thirty days, Frederick from seven to fourteen days.[11] Therefore, it was foreseeable that

---

11. Lieutenant Duhon also testified that an inmate placed in ad-seg on an emergency basis would receive review and hearing within 72 hours. Since no witness or party has suggested that Nettles was viewed as an emergency case, and because no hearing was ever provided, the court concludes it to be inappropriate to limit the foreseeable time to 72 hours.

Nettles might remain in ad-seg for fourteen days.

Given these findings, the court concludes an appropriate compensatory damage award to Nettles is $700.

### b. Punitive Damages

 Punitive damages are designed to punish a wrongdoer for "willful and malicious conduct and to deter others from similar behavior." *Stachura*, 477 U.S. at 307 n. 9, 106 S.Ct. at 2543 n. 9. Thus, plaintiff must prove that the defendants' acts were "maliciously, wantonly, or oppressively done." No facts presented with regard to his due process claim indicate willfulness, except for the wilful decision to place him in administrative segregation. *Franklin*, 795 F.2d at 1262. Plaintiff was deprived of the process to which he was entitled, but the lack of procedure was more the result of misstatement and miscommunication than malice. Consequently, plaintiff may recover no punitive damages.

### III. The Claim for Failure to Protect

### a. The Contentions

 Plaintiff contends that jail officials have a constitutional duty to protect prisoners from violence at the hands of other prisoners. He argues that his ad-seg cell assignment in "the nut run," where he was subject to taunts, personal indignities, uncollected garbage, and eventual injury while evacuating his cell during an inmate-induced fire, violated the Eighth Amendment's guarantee of freedom from cruel and unusual punishment.

Defendants deny plaintiff's averments and assert that while assigned to 3B Lower, plaintiff was subjected to no more danger from taunts, garbage, and fires than inmates housed on other floors and wings in the old Jail. Defendants acknowledge that inmate-induced fires were persistent, but contend they were a non-injury-producing phenomenon remedied before trial by implementation of a new policy prohibiting possession of smoking materials by inmates.

### b. The Evidence

There is little dispute in the evidence concerning operative facts. Plaintiff's injury sustained while exiting his cell during a fire is uncontroverted. It is conceded that inmate-induced fires occurred frequently and that jail officials were aware of their occurrence.

Several witnesses testified concerning jail fires. Plaintiff testified and tendered in addition two jail trusty inmates, Troy Anthony Williams and Billy Lee. Defendants presented testimony of Lieutenant Frederick and Officer Safar, both jail officials. While accounts varied in detail, they were consistent in confirming the astonishing fact that inmate-induced fires were common. The fires occurred at least once per shift and as often as three or four times an hour. Typically, inmates started fires by flicking lighted matches or other material already aflame out of their cells onto the run when trash or other flammables were present.

These fires were set for various reasons. Sometimes they were started as an amusement or to relieve boredom. Sometimes they were intended to aggravate staff or vex other inmates. A common reason was to achieve better ventilation, as jail officials would be forced to open outside vents to clear the smoke. The fires were not expected to cause injury, nor did they before plaintiff, other than the occasional minor smoke inhalation which was treated in the jail infirmary.

### c. Safekeeping and Deliberate Indifference

 The relevant constitutional provision is the Eighth Amendment.[12] The Con-

---

12. Because plaintiff was convicted at the time of the incident in question, analysis of his claims proceeds under the Eighth Amendment and corresponding precedent as it existed at the time the relevant conduct occurred. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court articulated and defined the differing constitutional analysis regarding the rights of pretrial detainees versus convicted prisoners. The American criminal law system is premised on the maxim that all persons are presumed innocent until proven guilty, therefore, pretrial detainees may not be subjected to "punishment" while in custody. *See id.* The Eighth Amendment, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual pun-

stitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Prison and jail officials have a duty to protect prisoners from violence at the hands of other prisoners. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Having incarcerated persons with demonstrated proclivities for antisocial, criminal, and often violent conduct, stripped them of virtually every means of self-protection, and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Jail conditions may be "restrictive and even harsh," *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), but gratuitously to allow beatings or other patently heinous activities by prisoners upon others serves no "legitimate penological purpose," *Hudson v. Palmer,* 468 U.S. 517, 548, 104 S.Ct. 3194, 3211, 82 L.Ed.2d 393 (1984) (Stevens, J., concurring in part and dissenting in part), any more than it comports with "evolving standards of decency." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

 However, every injury suffered by one prisoner at the hands of another does not result in constitutional liability for jail officials responsible for a prisoner's safety. Only deliberate indifference to a substantial risk of serious harm to an inmate constitutes cruel and unusual punishment as prohibited by the Eighth Amendment to the United States Constitution. *See Farmer v. Brennan,* ── U.S. ──, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling v. McKinney,* ── U.S. ──, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Wilson,* 501 U.S. at 294, 111 S.Ct. at 2322.

 A jail official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be sufficiently serious when viewed objectively. *See Hudson v. McMillan,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Second, the prison official must have a sufficiently culpable state of mind. *Farmer,* ── U.S. at ──, 114 S.Ct. at 1979; *Wilson,* 501 U.S. at 297, 111 S.Ct. at 2323.

 In prison conditions cases, the state of mind is one of deliberate indifference to

inmate health or safety. "Deliberate indifference" had been an amorphous term for many years until the Supreme Court acknowledged it had "never paused to explain the meaning of the term" and decided *Farmer v. Brennan* in 1994. *See Farmer,* ── U.S. at ──, 114 S.Ct. at 1978. Deliberate indifference thereafter is comprised of both an objective and subjective component, which includes actual knowledge of a known risk. The Supreme Court compared it to the standard for "criminal recklessness." *Id.* ── U.S. at ──, 114 S.Ct. at 1979. Additionally,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists and he must also draw the inference.

*Id.*

#### d. Analysis

At first glance, defendants' position appears illogical. It is absurd to argue that an inmate injured at the hands of another cannot demonstrate a constitutional violation simply because the danger to which he was subjected was no greater than dangers experienced by other inmates. The logical extension of this argument is that so long as all inmates are equally endangered, none can be subjected to cruel and unusual punishment.

Upon further review, however, the court views defendants' argument as inartful, but not specious. Properly construed, defendants' contention is that under the evidence, there can be no finding of deliberate indifference to inmate safety.

 As noted earlier, determination of deliberate indifference involves a two-prong analysis. Analysis of the second prong is unequivocal and dispositive. In order for an individual governmental defendant's state of mind to rise to the level of deliberate indifference to a serious risk, the defendant must "both be aware of facts from which the inference could be drawn that a substantial risk of

---

ishment inflicted," U.S. Const. amend. VIII,

therefore applies only to the convicted.

serious harm exists, and he must also draw the inference." *Farmer,* —— U.S. at ——, 114 S.Ct. at 1979. "[T]he obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him." *Farmer,* —— U.S. at —— n. 8, 114 S.Ct. at 1982 n. 8.

Plaintiff's Eighth Amendment claim turns on the issue of whether any defendant actually perceived plaintiff was subject to a serious risk of harm due to the fires. The evidence is overwhelming that no defendant had that state of mind. Lieutenant Simon was not even present. There is no evidence that Sheriff Griffith knew of the fires or drew an inference that a substantial risk of serious harm existed. Indeed, every witness from the old Jail viewed the fires as common, routine, jail events. They were perceived as nuisances, costly and time-consuming perhaps, but not safety related. Because the fires were ubiquitous and without injury precedent, one cannot resolve that the perception was wholly irrational.

This case must be decided consistently with *Gardener v. Cato,* 841 F.2d 105, 107 (5th Cir.1988) (per curiam). In *Gardener,* plaintiff was assigned to a cell also housing a mentally unstable inmate with access to cleaning fluids. The mentally unstable inmate threw chemicals into plaintiff's face and severely injured one of his eyes. Plaintiff contended that his constitutional right to safekeeping was violated by being placed in a cell with a mentally unstable inmate who had access to cleaning chemicals. The Fifth Circuit rejected the injured prisoner's claims. It held that his contention was "at best, an issue of the defendants' negligence...." *Id.*

Plaintiff's claim therefore fails.

#### IV. Attorneys Fees

Title 42 U.S.C. § 1988 authorizes the award of attorneys fees to the "prevailing party" in a civil rights action. "Plaintiffs may be considered 'prevailing parties' for purposes of attorneys fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir. 1978)). "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby,* —— U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992).

In this case, the court requested an attorney to accept an appointment to assist plaintiff at trial. In accepting the appointment, counsel for plaintiff fulfilled the ideal envisioned by Congress when it passed legislation allowing awards of attorney's fees: to permit plaintiffs with meritorious civil rights claims to obtain legal assistance otherwise unavailable to them. Because plaintiff is the prevailing party in his claim for due process deprivation, his counsel is entitled to reasonable attorney's fees.

The court invites opposing counsel to meet and confer within twenty days regarding a stipulation for a reasonable attorney fee. Absent agreement within that time, plaintiff's counsel is directed to submit to the court an hourly report of the time spent and an accounting of funds expended in prosecuting the case.

#### V. Conclusion

Final judgment shall be entered in accordance with this opinion, which constitutes the court's findings of fact and conclusions of law.